**Anthony E. MILLER, D.P.M., Appellant–Defendant,**

v.

**Georgia K. RYAN and Woodrow Ryan, Jr., Appellees–Plaintiffs.**

No. 29A02–9612–CV–818.

Court of Appeals of Indiana.

Feb. 25, 1999.

Joseph M. Scodro, Nana Quay–Smith, Karl L. Mulvaney, Candace L. Sage, Bingham Summers Welsh & Spilman, Indianapolis, Indiana, Attorneys for Appellant.

Robert W. York, Cynthia A. Marcus, York Schrager Baxter James & Rose Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

MATTINGLY, Judge

In this medical malpractice action, Anthony E. Miller, D.P.M. (Dr. Miller) appeals a jury verdict in favor of Georgia K. Ryan (Ryan) and Woodrow Ryan, Jr. (collectively, the Ryans). We restate the issues he raises as follows:

1. Whether the trial court erred when it refused to give an instruction that the law does not require that a physician guarantee that he will cure the patient or even that he will obtain a good result;

2. Whether the trial court erred when it instructed the jury that a podiatrist may not avoid responsibility during surgery by delegating part of that surgery to another podiatrist;

3. Whether the trial court erred when it instructed the jury that evidence of Dr. Miller's counsel's actions towards a member of the first medical review panel could be considered substantive evidence, as the conduct of an attorney is imputed to the client; and

4. Whether prejudicial evidentiary harpoons injected into the case by the Ryans' counsel, when viewed in conjunction with the improper instructions, require a new trial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In December of 1982, Ryan sought treatment with Dr. Thatcher, who practiced podiatry with Dr. Miller at the Burlington Clinic in Kokomo. Ryan, an insulin-dependent diabetic, complained of pain in her left foot. Dr. Thatcher diagnosed Ryan as suffering from, among other things, diabetic neuropathy,[1] and a dropped fourth metatarsal bone. He treated her by trimming a callous on the ball of her left foot, ordering x-rays, and prescribing some cream and shoe inserts. The record does not indicate that Ryan had complaints of any pain in her right foot. Ryan returned to Dr. Thatcher a week later and was fitted with the shoe inserts.

On March 24, 1983, Ryan returned to the Burlington Clinic, this time seeing Dr. Miller. Dr. Miller diagnosed that Ryan had problems, including bunions, with both her feet and recommended that she undergo bilateral foot surgery. Dr. Miller claimed that Ryan told him that she was experiencing pain in both feet. Ryan denied that she ever suffered from pain in her right foot. Dr. Miller testified that he informed Ryan of the risks of surgery, in addition to telling her that the pain from her diabetic neuropathy could not be addressed surgically. Ryan denied that she was advised of alternatives to or risks of surgery so that she could give an informed consent.

Ryan underwent bilateral foot surgery in April of 1983. Dr. Miller, designated as the surgeon, performed various surgical procedures on Ryan's left foot. Simultaneously, Dr. Thatcher, designated as the assisting surgeon, performed the same surgical procedures on Ryan's right foot. Since these surgeries, Ryan suffers pain in both feet. She has undergone corrective surgery on the right foot to repair a nerve cut during the first surgery and is expected to undergo the same surgery on her left foot.

The Ryans filed Proposed Complaints for medical malpractice against various defendants, including Dr. Miller, an anesthesiologist, and Ryan's internist. A medical review panel was formed consisting of Dr. Malament, a podiatrist and Drs. Losasso and Clark, neither of whom were podiatrists. After discovery and the submission of evidence to the medical review panel, the panel chair-

---

1. Diabetes often affects the nerves, causing complaints of loss of sensation, burning or shooting pains, numbness, discomfort or tingling in the feet.

man convened the panel. During that panel meeting, Drs. Malament, Losasso and Clark agreed to issue a finding that the internist and the anesthesiologist had met the applicable standard of care but that Dr. Miller had not.[2]

Subsequent to the panel meeting but before the panel chairman had circulated a written opinion for signature, Dr. Miller's counsel, Frederick LaCava (LaCava), contacted the panel chairman. After inquiring as to whether the panel required any additional information, LaCava was told by the panel chairman that the panel had already decided in favor of the anesthesiologist and the internist but had found that Dr. Miller breached the applicable standard of care.

LaCava then telephoned Dr. Malament and discussed the panel's findings with him. Unbeknownst to the parties and the other panel members, LaCava represented Dr. Malament in at least one unrelated medical malpractice case. Subsequent to that telephone conversation, Dr. Malament contacted the panel chairman and advised that he had changed his mind with regard to Dr. Miller. Dr. Malament told the panel chairman that he felt the evidence did not support the conclusion that Dr. Miller had failed to meet the applicable standard of care. Dr. Malament refused to sign the panel opinion. As a result, Drs. Losasso and Clark also refused to sign the opinion, as they had relied upon Dr. Malament's expertise as a podiatrist in forming their own opinions. The panel ultimately signed an opinion that found the anesthesiologist and the internist met the appropriate standard of care, but rendered no opinion as to Dr. Miller, noting that the issues involving Dr. Miller were to be submitted to another medical review panel.

A second medical review panel was convened and unanimously found that the:

> evidence does not support the conclusion that [Dr. Miller] failed to meet the applicable standard of care as charged in the Complaint except that it finds a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury, as to the limited issue of whether Dr. Miller adequately informed the patient that surgery might not alleviate all of her pain.

Supplemental R. at 190.

A disciplinary action was instituted against LaCava as a result of his actions toward Dr. Malament and the medical review panel. *See In re LaCava*, 615 N.E.2d 93 (Ind.1993).

The Ryans subsequently filed suit against Dr. Miller and the internist.[3] After a trial, a jury returned a verdict in favor of the Ryans for $325,000. The verdict included compensatory damages to Ryan of $290,000 and loss of consortium damages to her husband of $35,000.

## DECISION AND DISCUSSION

### 1. *Guarantee Instruction*

Dr. Miller submitted the following instruction (the "guarantee instruction"):

> The law does not require that a physician guarantee that he will cure his patient or even that he will obtain a good result. The law does require that a physician possess and use that degree of skill and learning which is ordinarily possessed by physicians under the same or similar circumstances at the time of the treatment or service.

> Accordingly, a physician will not be negligent if he exercises such reasonable care

---

**2.** There are four possible findings the medical review panel can make:

(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.

(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.

(3) There is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury.

(4) The conduct complained of was or was not a factor of the resultant damages. If so, whether the plaintiff suffered:

(A) any disability and the extent and duration of the disability; and

(B) any permanent impairment and the percentage of the impairment.

Ind.Code § 34–18–10–22(b).

**3.** The Ryans dismissed their case against the internist during the trial.

and ordinary skill even though he mistakes a diagnosis, makes an error in judgment or fails to appreciate the seriousness of the patient's problems.

R. at 610. This instruction was refused by the trial court.

We use a three-part inquiry with respect to refusal of a tendered instruction: 1) whether the tendered instruction is a correct statement of the law; 2) whether there is evidence in the record to support the instruction; and 3) whether the substance of the instruction is covered by other instructions given by the court. *Compton v. Pletch,* 561 N.E.2d 803, 805 (Ind.Ct.App.1990), *opinion adopted,* 580 N.E.2d 664 (Ind.1991). Further, an instruction which would tend to mislead or confuse the jury is properly rejected. *Shane v. State,* 615 N.E.2d 425, 428 (Ind.1993).

Even if the instruction is a correct statement of the law, is supported by the evidence, and is not covered by the other instructions, we will not reverse unless the failure to give the instruction substantially and adversely affects the rights of the complaining party so as to quite likely have affected the result. *Id.* Because we find that the guarantee instruction was not supported by the evidence, that it could have had the effect of misleading or confusing the jury, and that Dr. Miller was not prejudiced by the refusal of the instruction, we need not address whether the instruction was a correct statement of the law or whether its substance was covered by other instructions which were given.[4]

## A. *Instruction Unsupported by the Evidence/Confusion of the Jury*

It is error to refuse an instruction if there is evidence in the record to support the theory set forth in the instruction. *K Mart Corp. v. Beall,* 620 N.E.2d 700, 703 (Ind.Ct. App.1993). However, the trial court has considerable discretion in determining which issues have been raised by the trial evidence and in determining the form in which instructions will be given. *Webb v. Angell,* 155 Ill.App.3d 848, 108 Ill.Dec. 347, 508 N.E.2d 508, 514 (1987).

In *Brook v. St. John's Hickey Mem'l Hosp.,* 269 Ind. 270, 277, 380 N.E.2d 72, 76 (1978), our supreme court determined that refusal of a jury instruction was not error where the instruction "emphasized one aspect of a physician's duties which had not been supported by the evidence in the case." In that case, the defendant radiologist had chosen an injection site which was not recommended by the medical community. The plaintiff tendered an instruction which stated that a radiologist is not authorized to try "untested experiments" on patients. *Id.* at 274, 380 N.E.2d at 75. The supreme court determined that because the record showed the radiologist had "several compelling, professional reasons" for choosing the unusual injection site, the instruction about untested experiments was properly refused because it was unsupported by the evidence. *Id.* The court noted that "[t]oo often courts have confused judgmental decisions and experimentation[,]" and concluded that the instruction would have been misleading or confusing to the jury even though the instruction cor-

---

4. We believe that those parts of this instruction which do not address the absence of a "guarantee" requirement were adequately covered by the other instructions, as the jury was properly instructed as to the applicable standard of care:

   A podiatrist commits an act of malpractice when the podiatrist fails to exercise the degree of reasonable care and skill in providing health care to a patient that would be exercised by a reasonably careful, skillful and prudent podiatrist acting under the same or similar circumstances. The malpractice may consist of doing something that the podiatrist should not have done under the circumstances, or the failure to do something that the podiatrist should have done under the circumstances.

R. at 589. The jury was further instructed that:

   Podiatrists are allowed a wide range in the exercise of their judgment and discretion. They are not limited to the most generally used of several modes of treatment. When other approved methods of treatment are available, the podiatrist must exercise sound judgment as to the choice of treatment. The fact that other methods existed or that other doctors would have used a different treatment does not establish malpractice.

*Id.* at 609. As a result, we address only the "guarantee" portion of the instruction.

rectly stated the law. *Id.* at 274, 380 N.E.2d at 76.

Similarly, in *Hull v. Taylor,* 644 N.E.2d 622, 624 (Ind.Ct.App.1994), we decided that a plaintiff's tendered instruction on the last clear chance doctrine was properly refused, even though it accurately stated the law. By adopting the current comparative fault system, the legislature abandoned the negligence/contributory negligence system of analyzing fault. Under comparative fault, the need for an ameliorative doctrine such as last clear chance is eliminated: "Last clear chance in reality permits a comparison of fault ... instructing a jury on the doctrine of last clear chance would at best be cumulative." *Id.*

We found the last clear chance instruction was properly refused:

> [T]here is also more than a slight possibility that a jury given a last clear chance instruction in conjunction with comparative fault instructions might not recognize that the last clear chance instruction was merely a restatement of what they had already been told to assess. There is a strong risk that instructing on last clear chance would impose on the minds of the jury an impression that if a last clear chance scenario were present, the plaintiff need not be assessed any fault for the occurrence.

*Id.* at 624–25.

■ Dr. Miller argues that there was testimony[5] and evidence presented at trial with respect to "the issue of whether Dr. Miller promised Ryan that the surgery would cure her of her foot problems." Brief of Appellant at 33. For example, Ryan testified that Dr. Miller told her she needed surgery on both feet to "fix" the problems with each foot. R. at 1674. She further testified that Dr. Miller told her he would "fix" any problems with her feet and she would have no more pain. *Id.* at 1838. Finally, Dr. Miller's

counsel elicited testimony from Dr. Miller that he never guaranteed to any patient that his or her problems "would all go away." *Id.* at 2089.

■ We believe the testimony upon which Dr. Miller relies is more appropriately characterized as an exchange concerning a diagnosis of Ryan's condition and the appropriate treatment of that condition, not a guarantee that the treatment would be successful. As a result, like the instruction in *Hull,* the instant instruction could have imposed on the minds of the jury an impression that as long as Dr. Miller did not guarantee his results, he would not be obliged to meet the applicable standard of care in treating Ryan and that Ryan's consent to treatment would not have to be adequately "informed." At the very least, the tendered instruction could have had the effect of confusing and misleading the jury about that distinction. The trial court was within its discretion when it decided that the "guarantee" instruction should not be given.

### B. *Lack of Prejudice from Denial of Instruction*

Dr. Miller asserts he was prejudiced by the refusal of the guarantee instruction because without it "the jury could have found liability based on Ryan's theories that Dr. Miller's diagnosis and treatment of her condition was disputed or controversial, or because his treatment did not cure her foot problems." Brief of Appellant at 36.

■ We do not agree with Dr. Miller's characterization of the Ryans' "theories" as a guarantee of success or as malpractice based on controversial or disputed treatment methods. It is apparent from the trial record and the briefs of the parties that Ryan's central theories of liability were that her consent to the treatment was not sufficiently informed

---

5. Dr. Miller argues that, in addition to the references in the trial testimony, the Ryans "made [guarantee] an issue by statements of their counsel during opening argument," Reply Brief of Appellant at 16. He further notes that the Ryans stated in their appellate brief that Dr. Miller told Ryan she would get permanent relief from her pain and that Ryan argued she had a right to rely on his statements to that effect. It is well-established that statements by attorneys—in opening statements, closing arguments, or otherwise—are not evidence. *Bradford v. State,* 675 N.E.2d 296, 301 (Ind.1996), *reh'g denied.* We thus must decline Dr. Miller's invitation that we consider such statements by Ryan's counsel at trial and on appeal to be sufficient "evidence in the record" to support the instruction.

and that the treatment did not meet the appropriate standard of care. Thus, the jury could not have found liability on the "theories" Dr. Miller attributes to Ryan. Dr. Miller was not prejudiced by the refusal of the guarantee instruction.

Because the jury was thoroughly instructed on the law governing the appropriate standard of care and the nature of informed consent, Dr. Miller was not prejudiced when the trial court declined to instruct the jury on issues not argued by Ryan and not supported by the evidence offered in support of her theories of liability. The trial court did not err in refusing the guarantee instruction.

### 2. Delegation of Duty

The Ryans tendered, and the trial court gave, the following instruction:

If you find that a podiatrist in performing an operation is under a duty to his patient to protect the patient's nearby anatomical structures, then he may not delegate the duty to another podiatrist or assistant and thereby avoid responsibility.

R. at 594. This has been referred to as a "captain of the ship" instruction. Miller asserted that this instruction was ambiguous, that it contained vague medical terms, that there was no expert testimony to support the giving of this instruction, and that it invaded the province of the jury.

■■■■ A jury instruction which misstates the law will serve as grounds for reversal when the jury's verdict could have been based on the erroneous instruction. *Canfield v. Sandock*, 563 N.E.2d 1279, 1281 (Ind.1990). It is assumed that the erroneous instruction influenced the jury's verdict unless it appears from the evidence that the verdict could not have differed even with a proper instruction. *Id.*

The general language contained in this "captain of the ship" instruction was taken from *Funk v. Bonham*, 204 Ind. 170, 179, 183 N.E. 312, 315–16 (1932). In that case, our supreme court stated that "[a] surgeon performing the delicate operation of deep surgery cannot assign details of the operation to those who assist him in the operation, unknown to the patient, and escape liability by

delegating and relying upon such assistants to do and perform those acts which it was his duty to perform." *Id.* Indiana Pattern Jury Instruction No. 23.03 "Delegation of Duties," which also addresses this issue, reads:

A doctor in performing an operation is under a duty to [his][her] patient to remove [name the foreign object(s)] and may not delegate the duty and thereby avoid responsibility.

Dr. Miller asserts that *Huber v. Protestant Deaconess Hosp. Ass'n of Evansville*, 127 Ind.App. 565, 133 N.E.2d 864 (1956) supports his position that the "captain of the ship" instruction should not have been given. In *Huber*, the plaintiff was injured during an injection of spinal anesthetic by an anesthetist. The anesthetist was a hospital employee. The plaintiff sued the anesthetist, the hospital and the surgeon. The trial court, in ruling for the surgeon, stated: "[t]he cases uniformly hold that a surgeon is not liable for the negligence of the anesthetist unless such negligent acts of such anesthetist are committed under such circumstances as impose a duty on the surgeon to correct the anesthetist." 127 Ind.App. at 575, 133 N.E.2d at 869. Since the surgeon was out of the room when the anesthetist performed the injection, and as the anesthetist was experienced and qualified, we decided in *Huber* that the surgeon would not be held responsible for the negligent acts of the anesthetist.

Dr. Miller also argues that he cannot be held responsible for Dr. Thatcher's actions, as he and Dr. Thatcher were not involved in a "joint venture." In support, he cites *Watts v. Jankowski*, 411 N.E.2d 678 (Ind.Ct.App. 1980), where the plaintiff sought to hold the family physician responsible for a surgeon's actions under a joint venture theory. The court stated that there was no evidence of joint venture, as:

A joint venture is "An association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property and services." Each party must retain some control over the venture. There must be a community of interest in the purpose of the undertaking and an equal right to di-

rect and govern the movements and conduct of the other.

*Id.* at 680 (citations omitted).

Our supreme court has also acknowledged that "no such joint and common duty exists between a family physician and a surgeon whom he recommends. The basis of the rule is that it would be unjust to subject a family physician to liability for the wrongful acts of the surgeon, because the family physician has no dominion or control over the acts and decisions of the surgeon specialist." *Dahlberg v. Ogle*, 268 Ind. 30, 35–36, 373 N.E.2d 159, 162 (1978) (citations omitted).

██ The present case differs, however, from *Huber* and the cases regarding joint ventures. The relationship between Dr. Miller and Dr. Thatcher was more than just a referral situation. Dr. Miller was denoted on the operative report as the "surgeon,"[6] while Dr. Thatcher was listed as the "assistant." R. at 1989. There was evidence that Dr. Miller diagnosed Ryan's condition, determined that surgery was the appropriate treatment, determined which surgical procedures were necessary, convinced Ryan to undergo the surgical procedures, told Ryan that he would perform the surgical procedures, and scheduled the surgeries for both feet. Dr. Miller performed surgical procedures on Ryan's left foot, while, at the same time, Dr. Thatcher performed the same procedures on Ryan's right foot. Dr. Miller dictated the operative report. Nowhere in the report is it indicated that Dr. Thatcher performed any part of the surgery. It was therefore evident that Dr. Miller had control over what occurred in the operating room.

There was also expert testimony with respect to Dr. Miller's responsibilities. Dr. Melanie Sanders performed a subsequent surgery on Ryan's right foot. She testified that the surgeon who had performed the surgery on Ryan's right foot (Dr. Thatcher) had breached the standard of care by cutting a nerve and not burying it in a bone. She also opined that there was the same breach on the left foot. She testified that "whoever is the attending surgeon or the person that's listed as the primary surgeon is responsible for what you do and what your assistants and scrub nurses do." R. at 1017. She also testified that "if you're the primary surgeon, you are directing the other surgeon at all times." *Id.* at 1051.

In light of this evidence, this instruction was not improperly given. Even though Dr. Thatcher operated on the right foot, Dr. Miller was the primary/lead surgeon and dictated the operative report. Dr. Miller did not indicate on the report that anyone other than himself performed the surgeries. As the primary/lead surgeon, he was responsible for the tasks which he delegated in the operating room. As a result, Dr. Miller did have "dominion or control" over Dr. Thatcher, since he decided on the types of surgical procedures to be performed. *See Dahlberg*, 268 Ind. at 36–37, 373 N.E.2d at 163. The trial court did not err in giving the "captain of the ship" instruction under the facts of this case.

3. *Imputation of LaCava's Conduct to Dr. Miller*

██ The Ryans requested, and the court gave, the following instruction:

> Evidence of the actions taken by the defendant Dr. Anthony Miller's counsel, Mr. Frederick W. LaCava, towards a member of the first medical review panel and the circumstances surrounding said actions may be considered as substantive evidence, because the conduct of an attorney is imputed to the client.

R. at 604.

Dr. Miller argues that this instruction incorrectly states the law. We agree. In *United Farm Bureau Mutual Insurance Co. v. Groen*, 486 N.E.2d 571, 573 (Ind.Ct.App. 1985), *reh'g denied, trans. denied*, this court noted that:

> The attorney has by virtue of the retainer or employment alone, the general implied authority to do on behalf of the client all acts in or out of court *necessary or incidental to the prosecution or management of the suit or defense* or the accomplish-

---

**6.** Dr. Miller's status in the operating room has also been referred to as "lead" surgeon, R. at 2298, and "primary" surgeon. *Id.* at 1052.

ment of the purpose for which he was retained.

(Emphasis added.) We further found that because of the close identity of an attorney with the client represented, the client would be liable for the torts of the attorney "acting within the scope of his authority." *Id.* at 574. In the present case, the instruction given by the trial court was an incorrect statement of the law, as the language "within the scope of his authority" is conspicuous by its absence.

Ryan argues that Indiana law does not limit what acts of an attorney may be imputed to a client, citing *Farinelli v. Campagna,* 166 Ind.App. 587, 338 N.E.2d 299 (1975). In *Farinelli,* the plaintiff's case was dismissed as a result of a lawyer's failure to pursue prosecution of the case. In that context, we indicated that where the client voluntarily chooses the lawyer, he or she is deemed bound by that lawyer's acts. *Farinelli* cites to *Link v. Wabash R.R. Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), which states:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent....

The questions in the present case are whether LaCava had authority to bind Dr. Miller by his actions with respect to the medical review panel, and whether LaCava's actions were within the scope of that authority. In *Koval v. Simon Telelect, Inc.,* 693 N.E.2d 1299, 1301 (Ind.1998), our supreme court found that:

> [a]n attorney's authority may be derived from the conduct of the client, either with respect to the third parties who deal with the attorney or with respect to the attorney. It may also derive from the nature of the proceedings in which the attorney represents the client and enters into a settle-

ment agreement. In order to bind the client the attorney must have either express, implied, or apparent authority, or must act according to the attorney's inherent agency power.... [W]e conclude that the sole act of retaining an attorney does not give the attorney the implied or the apparent authority to settle or compromise a claim in an out of court proceeding.... However, under longstanding Indiana authority, retention does equip an attorney with the inherent power to bind a client to the results of a procedure in court.

*Koval* found that a mediation conducted under the Indiana Rules of Alternative Dispute Resolution was an "in court" proceeding. *Id.* at 1307. Likewise, a medical review panel meeting may be considered an "in court" proceeding, as it is conducted in front of a statutorily-approved panel chairman for the purpose of rendering a decision pursuant to Indiana statutes.

■ However, in this case LaCava's actions were outside the medical panel review process. The panel had already met and rendered a decision. The panel chairman had reduced that decision to writing and was in the process of circulating it to the panel members. LaCava contacted a member of the medical review panel after the panel had rendered its decision but before it was signed. Thus, this contact was an out of court contact for which LaCava did not have express, implied or apparent authority to bind his client.

■ Even if LaCava had authority, we believe his actions were outside the scope of that authority. There is no question that an attorney has the duty to zealously represent his or her client. Ind. Professional Conduct Rule 1.3 cmt. ("A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.") However, zealous representation of one's client does not encompass intentionally disobeying disciplinary rules. As noted in our supreme court's opinion in *LaCava,* 615 N.E.2d at 95–96, LaCava violated Professional Conduct Rule 3.5(c) by his ex parte communication with Dr. Malament before the medical review panel deci-

sion was rendered and engaged in conduct prejudicial to the administration of justice in violation of Professional Conduct Rule 8.4(d). The court stated that: "IND. CODE 16–9.5–9–5 prohibits communication before a decision is rendered under Section 7, which requires the rendition of the written opinion by the panel. The Respondent is an experienced practitioner who can be assumed to understand that there is no decision until it is reduced to writing. When he contacted Dr. Malament, if he was not aware of these provisions, he should have been." *Id.* at 96.

Further, there was no testimony that Dr. Miller knew that LaCava was going to contact or did contact Dr. Malament. Dr. Miller did not instruct LaCava to do so. We do not believe it was within the scope of LaCava's employment to intentionally disobey the law or the Rules of Professional Conduct by directly contacting a member of a medical review panel before that panel had issued its opinion. As a result, this instruction was incorrectly given.

■ We assume that an erroneous instruction influenced a jury's verdict "unless it appears from the evidence that the verdict could not have differed even with a proper instruction." *Canfield,* 563 N.E.2d at 1282. In the present case, there was a significant amount of evidence presented as to Dr. Miller's breach of the appropriate standard of care and of the relationship of that breach to Ryan's injuries. For example, there was testimony from Dr. Sanders that Dr. Miller breached the standard of care. There was evidence that Dr. Miller, before recommending bilateral foot surgery, did not attempt conservative treatment for a sufficient length of time. The medical records, prior to Dr. Miller's recommendation of surgery, did not clearly document that Ryan was experiencing pain in her right foot. There was also testimony by Dr. Sanders that Dr. Miller's incision in the left foot was in an improper place and that, therefore, a nerve had been cut. There was further testimony by Dr. Sanders that the surgical procedures performed by Dr. Miller and Dr. Thatcher were not necessary. As a result, we cannot say that this improper instruction influenced the jury's verdict.

### 4. *Evidentiary Harpoons*

■ Dr. Miller asserts that there were two evidentiary harpoons by the Ryans which were unwarranted, improper, and prejudicial to him. The first alleged evidentiary harpoon occurred when Dr. Thatcher was asked by the Ryans' counsel if he had ever referred to Dr. Miller as "cut and cash." R. at 771. Dr. Miller's attorney objected to that comment and the objection was sustained. However, the Ryans' attorney continued to ask questions about the "cut and cash" comment. Dr. Miller's attorney did not object to these additional questions. As a result, Dr. Miller's challenge to this line of questioning is waived. *Mftari v. State,* 537 N.E.2d 469, 473 (Ind.1989).

■ The second alleged evidentiary harpoon was a reference by the Ryans' counsel during Dr. Miller's cross-examination with respect to his having been sued eleven other times. Dr. Miller's objection to this reference was sustained. Dr. Miller's request for a mistrial was denied. However, Dr. Miller's counsel did not ask for an admonition to the jury, nor did he renew his motion for a mistrial. In *Bardonner v. State,* 587 N.E.2d 1353, 1357 (Ind.Ct.App.1992), this court stated that where counsel failed to request that the trial court admonish the jury after denial of a motion for mistrial, error was waived. We find that Dr. Miller therefore has waived his challenge to this comment.

Dr. Miller's assertions of error regarding these alleged evidentiary harpoons have not been preserved for our review.

### CONCLUSION

The trial court did not abuse its discretion when it refused to give the "guarantee" instruction Dr. Miller tendered, as the tendered instruction was not supported by the evidence. The "captain of the ship" instruction was properly given where Dr. Miller was the primary/lead surgeon. The trial court erred by giving an instruction imputing all of LaCava's conduct to Dr. Miller, as the instruction was an improper statement of Indiana law. However, this error was not reversible error, as it appears from the evi-

dence that the verdict could not have differed even with a proper instruction. Further, Dr. Miller's assertion of improper evidentiary harpoons at trial has not been preserved for review on appeal.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.