# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**BRADLEY D. HARVILLE**
Louisville, Kentucky

ATTORNEYS FOR APPELLEE:

**JEFFREY L. HANSFORD**
**TYSON P. SCHROEDER**
Boehl Stopher & Graves, LLP
New Albany, Indiana



FILED

May 21 2013, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

CHARLES PICKERING,                          )
                                            )
    Appellant-Plaintiff,              )
                                            )
      vs.                          )    No. 31A01-1209-CT-429
                                            )
CAESARS RIVERBOAT CASINO, LLC,              )
d/b/a HORSESHOE SOUTHERN INDIANA,           )
                                            )
    Appellee-Defendant.               )

APPEAL FROM THE HARRISON SUPERIOR COURT
The Honorable Roger D. Davis, Judge
Cause No. 31D01-1110-CT-47

**May 21, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Charles Pickering appeals the trial court's order granting summary judgment in favor of Caesars Riverboat Casino, LLC, d/b/a Horseshoe Southern Indiana ("Caesars"). Pickering raises one issue which we revise and restate as whether the court erred in granting Caesars' motion for summary judgment. We affirm.

FACTS AND PROCEDURAL HISTORY

The relevant facts as designated by the parties follow. On the morning of January 22, 2011, Charles Pickering and two companions, Jim Bell and Rob Tackett, traveled to Caesars. Bell and Tackett intended to play in a slot tournament that day, and Pickering was "tagging along." Appellant's Appendix at 18. It was very cold that morning, and snow was on the ground. Before leaving, Pickering decided to wear a pair of "restaurant shoes" which are "[s]upposed to keep you from falling." Id. at 20.

Bell normally parked on the rooftop level of Caesars' parking garage and entered the casino by way of an entrance located on that top level, but on this occasion access to the ramp and the rooftop level was blocked by yellow caution tape, a saw horse, and three orange barrels due to the snow on the rooftop. Bell parked near the barricade, the men exited the vehicle, and they noted footprints in the snow leading up the ramp and accordingly assumed that the rooftop doors were open. The men then decided to proceed on foot up the ramp to enter the casino via the rooftop entrance, and in so doing, ducked underneath the yellow caution tape. Upon arriving at the rooftop entrance, one of the men tried to open the doors and discovered that they were locked, and they turned and walked back down the ramp. While ducking underneath the caution tape after returning

2

from the rooftop, Pickering "turned" and then slipped and fell to the ground. Id. at 29. Pickering fractured his pelvis as a result of the fall.

On October 21, 2011, Pickering filed a complaint against Caesars in the Harrison County Superior Court.[1] On March 19, 2012, Pickering gave deposition testimony. On May 25, 2012, Caesars filed a motion for summary judgment, memorandum of law in support, and designation of evidence, noting that Pickering's complaint alleged that Caesars was negligent in maintaining its premises in a reasonably safe condition but that it "does not state that Mr. Pickering, and his companions, arrived at the casino garage and found the top floor of the parking garage barricaded and closed to all traffic due to the accumulation of snow from a weather event the preceding day" nor "does it relate how [Pickering] and his companions had to pass beyond the traffic barrels and underneath caution tape, that were barricading the ramp from traffic, to access the open-to-the-weather and snow-covered parking garage ramp where the fall occurred." Appellant's Supplemental Appendix at 5.

On June 21, 2012, Pickering filed a response and memorandum of law in opposition to Caesars' motion for summary judgment which contained a recitation of facts stating that certain photographs Caesars produced pursuant to Pickering's request for production of documents, as well as surveillance video showing Pickering's fall, "reveal that [Pickering's] memory of this event to which he testified in his deposition is mistaken in two very important respects: 1) Access to the top level was far from being completely blocked off . . . . And, 2) [Pickering] was not bending over to go underneath

---

[1] A copy of Pickering's complaint is not included in the record.

the caution tape when he fell . . . ." Id. at 40. On July 20, 2012, Caesars filed its reply brief in support of summary judgment in which it noted at the outset that Pickering's response "fails to create a material issue of fact because it premises its argument on [a] mischaracterization of the unambiguous facts," specifically that "at the time of his injury part of the ramp was open, and that [Pickering] was mistaken in his sworn deposition testimony wherein he stated the ramp was completely blocked off and he fell while trying to get under the caution tape . . . ." Id. at 94. Caesars stated that Pickering cited "to photographs from an incident report that was created for a different patron [named David Sells], at a different time, and is arguing the conditions were the same fourteen hours later . . . ." Id. Caesars also noted that "the barricades can be clearly seen on the surveillance video which [had] been produced to" Pickering.[2] Id. Caesars attached as Exhibit C a work order which noted that, about four hours after Sells's fall and nine hours prior to Pickering's fall, a Caesars maintenance worker "spread ice melt on top level ramp CPG. rope off ramp." Id. at 104.

The court held a summary judgment hearing on August 28, 2012, in which arguments were presented. Caesars displayed a picture "cut from the video" of

---

[2] Caesars' reply also contained the following statement:

Although not relevant to the instant action, Caesars would represent to the Court the ramp area was, indeed, not fully cordoned off until after the Sells incident on the day before Mr. Pickering's accident. Although not relevant, testimony would reveal the ramp was not fully barricaded initially because there were vehicles parked on the top of the garage and a lane was left open so those vehicles could exit the facility. However, the ramp area was fully cordoned off after the accident the day before Mr. Pickering's fall, as evidenced by Mr. Pickering's testimony, the video, Caesars['] answers to discovery, and the work order that was generated the evening before Mr. Pickering's fall to accomplish the closure.

Appellant's Supplemental Appendix at 97.

4

Pickering's fall and noted for the court that it showed "barrels with reflective tape . . . saw horses and . . . yellow caution tape which [had] been extended all the way across not only the driveway but two sidewalks on both sides of the driveway." Transcript at 9. Pickering replied that the picture was inconclusive as to where the caution tape terminated based on the angle displayed. Pickering also argued at the hearing that even if Pickering did duck underneath the caution tape, that did not end the matter because Caesars knew of Sells's fall about fourteen hours earlier and "[i]nstead of moving the snow and ice all they did was string the tape further" despite the fact that there were "footprints all over this ramp" so that "clearly at the time of [Pickering's] fall there was evidence of pedestrian traffic going up and down that ramp . . . ." Id. at 23. Pickering also noted that Caesars did not post signage indicating either that the ramp was closed or that the top entrance was closed. The court also viewed a video of the fall which Caesars had designated as evidence. At the conclusion of the hearing, the court granted Caesars' motion for summary judgment.

ISSUE AND STANDARD OF REVIEW

The sole issue is whether the court erred in granting Caesars' motion for summary judgment. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. We must

5

carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. Id. at 974. In reviewing a grant of summary judgment we face the same issues as the trial court and follow the same process. Klinker v. First Merchs. Bank, N.A., 964 N.E.2d 190, 193 (Ind. 2012). Under Trial Rule 56(C), the moving party bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Id. If it is successful, the burden shifts to the nonmoving party to designate evidence establishing the existence of a genuine issue of material fact. Id.

"In order to prevail on a claim of negligence, a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." Wabash Cnty. Young Men's Christian Ass'n, Inc. v. Thompson, 975 N.E.2d 362, 365 (Ind. Ct. App. 2012) (quoting Peters v. Forster, 804 N.E.2d 736, 738 (Ind. 2004)), reh'g denied, trans. denied. "In negligence cases, summary judgment is 'rarely appropriate.'" Id. (quoting Rhodes v. Wright, 805 N.E.2d 382, 387 (Ind. 2004)). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." Id. (quoting Rhodes, 805 N.E.2d at 387). "Nevertheless, a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim." Id.

6

DISCUSSION OF PREMISES LIABILITY; ARGUMENTS OF PARTIES

Pickering's negligence claim is based on premises liability. The law is well established that a person entering upon the land of another comes upon the land as an invitee, a licensee, or a trespasser. Christmas v. Kindred Nursing Ctrs. Ltd. P'ship, 952 N.E.2d 872, 878 (Ind. Ct. App. 2011). Thus, the first step in resolving a premises liability case is to determine the plaintiff's status. Id. The status then defines the duty owed from the landowner to the visitor. Id. "As a general rule, '[a] person's status on the land, along with the duty owed, is a matter left for determination by the trial court, not the jury.'" Winfrey v. NLMP, Inc., 963 N.E.2d 609, 613 (Ind. Ct. App. 2012) (quoting Dunifon v. Iovino, 665 N.E.2d 51, 55 (Ind. Ct. App. 1996), reh'g denied, trans. denied); see also Morningstar v. Maynard, 798 N.E.2d 920, 922 (Ind. Ct. App. 2003) ("[W]hen the question is one of the plaintiff's visitor status, the issue is a matter of law and is proper for summary judgment."); but see Kopczynski v. Barger, 887 N.E.2d 928, 931 (Ind. 2008) ("[T]he existence of a duty is ordinarily a question of law for the court to decide, but it may turn on factual issues that must be resolved by the trier of fact.") (citing Rhodes, 805 N.E.2d at 386 ("While it is clear that the trial court must determine if an existing relationship gives rise to a duty, it must also be noted that a factual question may be interwoven with the determination of the existence of a relationship, thus making the ultimate existence of a duty a mixed question of law and fact."); RESTATEMENT (SECOND) OF TORTS § 332 cmt. l (1965) ("Since the status of the visitor as an invitee may depend upon whether the possessor should have known that the visitor would be led to believe that a particular part of the premises is held open to him, the question is often one

of fact for the jury, subject to the normal control which the court exercises over the jury's function in such matters.")).

An invitee can be categorized as a public invitee, a business visitor, or a social guest. Christmas, 952 N.E.2d at 879 (citing Burrell v. Meads, 569 N.E.2d 637, 642 (Ind. 1991), reh'g denied). Here, Pickering claims that he was a business visitor at the time of his fall. The Indiana Supreme Court has adopted Restatement (Second) of Torts Section 332 to define a "business visitor" as "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land." Id. (citing Taylor v. Duke, 713 N.E.2d 877, 881 (Ind. Ct. App. 1999) (citing Burrell, 569 N.E.2d at 637)). Licensees and trespassers are defined as those who enter the land of another for their own convenience, curiosity, or entertainment and take the premises as they find them. Id. Unlike trespassers, however, licensees have a privilege to enter or remain on the land by virtue of the landowner's permission or sufferance. Id. Also, this court has previously observed comments to the Restatement (Second) of Torts, noting that the comments to Section 330, which defines "licensee," provides that "the word 'consent' or 'permission' indicates that the possessor is in fact willing that the other shall enter or remain on the land, or that his conduct is such as to give the other reason to believe that he is willing that he shall enter, if he desires to do so." Id. Further, the comments to Section 332, which defines "invitee," clarifies the difference between invitation and permission by stating: "An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is

8

willing that they shall enter if they desire to do so." Id.; see also Rhoades v. Heritage Invs., LLC, 839 N.E.2d 788, 792 (Ind. Ct. App. 2005) (citing the comments to the Restatement (Second) of Torts §§ 330, 332 with approval), reh'g denied, trans. denied.

Pickering argues that the court erred in granting summary judgment because "the caution tape did not excuse Caesars' duty to make its premises safe from the hazardous condition of ice and snow, given the visible footprints in the area that led Pickering . . . to believe that other customers were walking up the ramp and that the top entrance was open." Appellant's Brief at 11. Pickering maintains that there is a general duty for business owners to remove ice and snow from their premises, that whether this duty has been breached is generally an issue for the trier of fact, and that "there is no issue that Caesars had discovered the condition of ice and snow on the ramp of its parking garage," noting that another customer "had slipped and fallen in the exact same area some 14 hours earlier." Id. at 11-12. Pickering contends that Caesars "had a duty to its customers beyond merely stringing the caution tape across the entire width of the ramp after Sells' fall" because "there remained numerous footprints in the snow going up and down the ramp in the area cordoned off by the caution tape" which led to the logical conclusion "that other patrons had been walking up and down the ramp despite the presence of the caution tape, and that the entrance on the top level of the parking garage that they customarily used was open when in fact it was closed." Id. at 12. Pickering also asserts that Caesars therefore breached its duty to exercise reasonable care "by failing to clear the ramp of ice and snow," or, "[i]n the alternative . . . breached a duty to warn its

customers that the top entrance to the casino was closed, which would have alerted its customers to ignore the footprints . . . ." Id. at 12-13.

Caesars begins by noting that "[t]he facts in this case are not in dispute" in which Pickering, a business invitee, "decided to duck underneath a barricade to access a portion of the parking garage that was undisputedly closed to vehicular traffic because it was undisputedly covered in snow." Appellee's Brief at 3-4. Caesars argues that "[t]he only question pertinent to this case is whether Caesars, as a matter of law, had fulfilled its duty to its patrons when it cordoned off the exposed levels of the parking garage with caution tape and traffic barrels." Id. at 4. Caesars also asserts that the question of a visitor's status is a matter of law proper for summary judgment, and here, when Pickering crossed the caution tape his status changed from that of a business invitee to a licensee because he exceeded the scope of his invitation. Caesars maintains that "[t]here is nothing usual and/or customary about crossing beneath caution tape and other traffic control devices to access a portion of the property that is visibly covered with an icy hazard," and its "invitation cannot be reasonably believed to extend to all of the property." Id. at 7.

Caesars also argues that "[t]here is no question Mr. Pickering had actual knowledge of the condition of the property" and he therefore incurred the risk when he proceeded to cross under the caution tape and embark upon the ramp. Id. at 10. Further, Caesars contends that, even if Pickering were to be considered an invitee, it did not breach its duty to Pickering because he "was fully aware of the need for caution" which "was so obvious that it was written on the yellow tape that [he] ducked under to access this portion of the property." Id. at 11.

10

In his reply brief, Pickering argues that "the 'footprints in the snow' are the key reason why Caesars had a duty to the unwary patron to post some kind of additional notice, at the very least, that the top entrance to the ramp was closed." Appellant's Reply Brief at 4. He contends that the "literally dozens if not hundreds of footprints [] suggested to Mr. Pickering and his companions that use of the ramp was clearly 'contemplated' at the time he fell, just as this same ramp was in use some fourteen (14) hours earlier when Mr. Sells fell." Id. at 5. He also asserts that he "had no way of knowing that the yellow caution tape had been strung across the ramp *after* those footprints were made in the snow" and that "it was anything but clear to him and his companions that the yellow caution tape was intended to close off pedestrian traffic as well as vehicular traffic." Id. Pickering finally argues that "[a]ll Caesars had to do to save [him] from a broken hip was to post a sign at the bottom of the ramp that the top entrance was closed" and that "[u]nder the circumstances, it had a duty to do at least that much." Id.

ANALYSIS

On appeal, Pickering concedes that the designated evidence demonstrates that he, along with Bell and Tackett, decided to exit the enclosed portion of the parking garage and traverse a snow-covered ramp up to the rooftop level in order to enter the casino from the rooftop entrance and, in so doing, ducked underneath and crossed yellow caution tape which the casino had placed in order to prevent traffic from accessing the rooftop level. The men apparently deduced that the doorway was open due to the presence of footprints in the snow leading from the rooftop entrance and down the ramp. When the three men

11

arrived at the doors they realized that the doors were locked, and they turned around and headed back down the ramp. As Pickering was ducking underneath the caution tape on his way down, he fell and fractured his pelvis.

At the time when Pickering came into Caesars' parking garage and exited the vehicle which had been parked in an enclosed portion of the garage, he was undoubtedly a business visitor invitee. As argued above by Caesars, however, "even when dealing with an invitee, the landowner's duty of care is not limitless." Rider v. McCamment, 938 N.E.2d 262, 268 (Ind. Ct. App. 2010). One way in which an invitee may lose his or her status is when the invitee exceeds the scope of the invitation. Id. (citing Markle v. Hacienda Mexican Rest., 570 N.E.2d 969, 974 (Ind. Ct. App. 1991)). Indeed, the Indiana Supreme Court, in Burrell, specifically instructed that a person is an invitee if "the possessor [of land] *encourages another to enter* to further his own purpose such that there *arises the implicit assertion that reasonable care has been exercised to make the place safe* for the one who came for that purpose." Burrell, 569 N.E.2d at 641 (emphases added). This court has additionally observed that "to *retain* invitee status, 'the invitee must use the owner's premises in the usual, ordinary, and customary way.'" St. Mary's Med. Ctr. of Evansville, Inc. v. Loomis, 783 N.E.2d 274, 282 (Ind. Ct. App. 2002) (quoting Markle, 570 N.E.2d at 974 (quoting 65 C.J.S. Negligence § 63(52) (1966))) (emphasis added).

In St. Mary's, Dr. Loomis was a neurosurgeon in private practice who had surgery privileges at the defendant Hospital. Id. at 277. On the date in question, Dr. Loomis was visiting patients in the Hospital when he stopped at a pantry to pour himself a cup of

12

coffee. Id. "Dr. Loomis, other physicians, and the Hospital's employees regularly used the pantry for coffee breaks." Id. While in the pantry, Dr. Loomis slipped and fell, injuring his left elbow. Id. at 277-278. Following a jury trial, the Hospital submitted final jury instructions including an instruction defining the term "licensee," and the court refused to tender the proposed instruction, instead instructing "the jury that Dr. Loomis was an invitee to whom the Hospital owed a duty of reasonable care." Id. at 278.

On appeal, the Hospital challenged the trial court's determination of Dr. Loomis's status, arguing that Dr. Loomis was a licensee when he entered the pantry rather than an invitee. Id. at 281-282. Specifically, the Hospital argued that, although Dr. Loomis was an invitee prior to entering the pantry, he "exceeded the scope of his invitee status upon entering the pantry, as signs posted on the pantry doors read 'Employees Only'" and that "Dr. Loomis was not an employee of the Hospital . . . ." Id. at 282.

We began our analysis of the issue by noting that "the 'issue' of a plaintiff's status on the land does not warrant such an instruction but is an issue solely for the trial court, as this court has held." Id. at 282. We observed, on that score, that the evidence "showed that the signs on the pantry doors were not meant to exclude the physicians" and that rather they "were 'a courtesy [sic] way of telling families, patients, and visitors that this is an area that you should not be in.'" Id. We also noted that Dr. Loomis had been using the pantry for years and had never been asked to leave, and we accordingly held that "it was 'usual, ordinary, and customary' for physicians to use the pantry" and "that an invitee instruction was warranted." Id. at 283.

Here, by contrast, we find that Caesars intended to exclude its patrons including Pickering from accessing the snow-covered ramp and rooftop level of the parking garage and that Pickering exceeded the scope of his invitee status when he entered the restricted area. Indeed, the designated evidence reveals that Caesars placed not only a saw horse and barrels to prevent vehicular traffic from accessing the ramp, but also it strung yellow caution tape spanning the length of the entrance to prevent pedestrian traffic. Pickering and his companions ducked underneath the barricade in order to access the ramp area, which is not usual, ordinary, or customary when entering upon business premises. As the Indiana Supreme Court instructed in Burrell, above, the implicit assertion that reasonable care has been exercised to make a premises safe attendant to invitee status stems from a land possessor's *encouragement* that another enter onto his or her premises. See Burrell, 569 N.E.2d at 641. Thus, it can hardly be held that a person may enjoy invitee status when that person crosses onto or enters an area which the land possessor has specifically and visibly restricted. See also Winfrey, 963 N.E.2d at 612-613 ("All agree that Winfrey first entered Appellees' property as an invitee. The question is whether Winfrey's actions following his doctor's appointment transformed him into a licensee, lowering Appellees' standard of care to him. '[E]ven though a visitor may be an invitee when he comes on to the property, his status may change to that of a licensee while he is on the premises if the use to which he puts the property does not correspond to the owner's reason for holding the property open.'").

14

When Pickering ducked underneath the caution tape and proceeded up the ramp, he lost his status as an invitee and was a mere licensee.[3]  Being a licensee, Caesars owed Pickering a "duty to refrain from willfully or wantonly injuring him or acting in a manner to increase his peril."  Id. at 612.  Pickering has not designated any evidence to demonstrate that Caesars either willfully or wantonly injured him, or that it did anything

---

[3] To the extent Pickering suggests that the presence of footprints in the snow leading up and down the ramp should preserve his status as an invitee, we disagree.  First, we agree with Caesars that such footprints suggest only that there had been foot traffic present at one time and did not necessarily suggest that the ramp was currently open to foot traffic.  Also, we note that even if the footprints suggested that others had traversed the ramp following the placement of the caution tape, Pickering and his companions nevertheless chose to cross a barricade and proceed up the ramp despite the presence of alternative entrances which were not cordoned off.  The simple fact that others may have made a similar calculation as Pickering and his companions to forego their invitee status and cross a barricade at a place of business does not require a conclusion that crossing the barricade should be viewed as usual, ordinary, and customary.

Further, we note that even if Pickering was still considered an invitee when he crossed the barricade, summary judgment for Caesars would still be appropriate because the trial court could decide as a matter of law that Pickering incurred the risk of falling.  "Incurred risk has been generally defined as 'the conscious, deliberate and intentional embarkation upon the course of conduct with knowledge of the circumstances. . . .  Incurred risk contemplates acceptance of a specific risk of which the plaintiff has *actual* knowledge.'"  St. Mary's Byzantine Church v. Mantich, 505 N.E.2d 811, 814 (Ind. Ct. App. 1987) (quoting Power v. Brodie, 460 N.E.2d 1241, 1243 (Ind. Ct. App. 1984)), reh'g denied, trans. denied.  As explained in Mantich:

> [w]here the evidence on the question of assumed or incurred risk presents an issue of fact, that issue is for the jury, but where there is no real dispute in the evidence bearing on that question, it is for the court to say as a matter of law that the plaintiff assumed or incurred that risk.

Id. (quoting Pierce v. Clemens, 113 Ind. App. 65, 77, 46 N.E.2d 836, 841 (1943)).  Also, "[a]ctual knowledge is the prerequisite element of incurred risk, and therefore the trial court must employ a subjective analysis to determine whether the actor actually knew of and voluntarily accepted the risk."  Id. (citing Beckett v. Clinton Prairie Sch. Corp., 504 N.E.2d 552 (Ind. 1987)).

Here, Pickering testified at his deposition that he decided to wear "restaurant shoes" because snow had recently fallen, he knew that snow and ice were slippery, and the shoes were "[s]upposed to keep you from falling."  Appellant's Appendix at 20.  He also testified that he observed snow in the walkway as he started walking up the ramp.  Id. at 27.  Thus, we find that the evidence clearly establishes that Pickering knew that he was at risk of falling when he decided to duck underneath the caution tape and venture up the snow-covered ramp.  Therefore, Pickering incurred the risk of his injuries as a matter of law.  See Mantich, 505 N.E.2d at 815 (holding that the evidence "clearly" established that the plaintiff incurred the risk of falling on a steep ramp as a matter of law when she "voluntarily continued to use the ramp").

to increase his peril. Indeed, if the peril in this case is the presence of snow and ice on the ramp and rooftop level, then Caesars' actions *decreased* Pickering's level of peril by posting a barricade which should have alerted him to the presence of the snow and ice. Thus, we conclude that the trial court did not err when it granted Caesars' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, we affirm the court's grant of summary judgment in favor of Caesars.

Affirmed.

RILEY, J., and BRADFORD, J., concur.