# FOR PUBLICATION



**FILED**

Oct 10 2013, 5:40 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**DANIEL H. PFEIFER**
**JEROME W. MCKEEVER**
Pfeifer, Morgan & Stesiak
South Bend, Indiana

ATTORNEYS FOR APPELLEES:

**ANDREW B. MILLER**
**SHANNON G. STARR**
Starr Austen & Miller, LLP
Logansport, Indiana

**BARRY L. LOFTUS**
**JORDAN J. SZYMIALIS**
Stuart & Branigin LLP
Lafayette, Indiana

**MICHAEL H. MICHMERHUIZEN**
**CHARLES C. DUBES**
Barrett & McNagny LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| JOHN EINHORN and ROXANNE EINHORN, | ) |
| | ) |
| Appellants-Plaintiffs, | ) |
| | ) |
| vs. | ) No. 50A03-1303-CT-93 |
| | ) |
| SCOTT JOHNSON, GRETCHEN JOHNSON, PURDUE | ) |
| UNIVERSITY BOARD OF TRUSTEES d/b/a PURDUE | ) |
| UNIVERSITY COOPERATIVE EXTENSION SERVICE, and | ) |
| MARSHALL COUNTY 4-H FAIR ASSOCIATION, INC., | ) |
| | ) |
| Appellees-Defendants. | ) |

APPEAL FROM THE MARSHALL CIRCUIT COURT
The Honorable Douglas B. Morton, Special Judge
Cause No. 50C01-1011-CT-42

**October 10, 2013**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

John and Roxanne Einhorn appeal the trial court's grant of summary judgment in favor of Purdue University Board of Trustees d/b/a Purdue University Cooperative Extension Service ("Purdue"), Marshall County 4-H Fair Association, Inc. ("4-H Fair Association"), and Scott and Gretchen Johnson on the Einhorns' complaint for damages alleging negligence. The Einhorns also appeal the trial court's order dismissing their complaint against Purdue for lack of subject matter jurisdiction. The Einhorns present the following dispositive issues for our review:

1.    Whether the trial court erred when it concluded that it lacked subject matter jurisdiction over their claims against Purdue.

2.    Whether the trial court erred when it concluded that Purdue and 4-H Fair Association are immune from liability under the Equine Activity Statute as a matter of law.

3.    Whether the trial court erred when it concluded that the Johnsons were not negligent as a matter of law.

We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

On July 12, 2009, eleven-year-old Renae Johnson was riding her horse, Clu, in the practice arena at the Marshall County 4-H Fairgrounds ("the Fair") when a nearby truck backed up, sounding a back-up alarm, and "spooked" Clu. Johnsons' App. at 83. Clu bucked Renae off of him three times in the course of an hour after being spooked, and each time she got bucked off, Renae walked him around the arena before remounting him. Renae's parents were not present in the arena, but Gretchen had earlier asked Dawn Thomas to watch Renae's practice. After the bucking incidents, Thomas told Renae that

2

she was not "comfortable with this" and that they needed to "find someone to help us put [Clu] away." Appellants' App. at 322. Thomas asked Dean Datson, who was standing nearby, to help her and Renae walk Clu over to the barn, and he agreed.

After Clu was placed in a stall in the barn, Thomas found Gretchen and told her about the bucking incidents in the practice arena. The Johnsons then enlisted the help of Tim Rice, who was an experienced horseman, to help calm Clu. Rice and Renae proceeded to clip a lead rope onto Clu and lead him out of the stall. They quickly encountered "a bunch of kids and horses running around which caused Clu to speed up." Johnsons' App. at 249. Rice "went to grab a hold of the lead rope to pull Clu back when the lead rope popped. The spring loaded clasp on the lead rope failed[,]" and Clu came loose and walked fifteen to twenty feet outside the barn. Id. Rice and Renae tried to get Clu and were three feet away from him when "kids went by with horses and began hollering and yelling 'loose horse' which caused Clu to trot over by the tent with other horses." Id. Clu then "took off." Id.

John, who was serving as President of the 4-H Marshall County Horse & Pony Advisory Committee,[1] was riding in an off-road vehicle with his son around the fairgrounds. John had parked the vehicle near the horse barn when he heard someone yell, "Loose horse!" Purdue's App. at 36. John told his son to stay in the vehicle, and John was out of the vehicle and walking when Clu galloped past him and away from the horse barn. Approximately ten seconds later, Clu was running toward the horse barn, and then John saw Clu running through the barn. John then lost sight of Clu and returned to

---

[1] The Horse & Pony Advisory Committee was involved in supervising horses on the fairgrounds and providing safety at the Fair.

3

his vehicle. A short time later, John's son reported that the horse was coming back again, and John exited the vehicle and found himself in the path of the running horse.[2] John put his arms up and said "Whoa" several times before Clu trampled John. As a result of the collision, John sustained severe injuries.

At the time of the incident, John was working as an unpaid volunteer at the 4-H Fair. Nine days later, on July 21, he was notified that he was eligible for medical benefits under Purdue's workers' compensation policy. John ultimately received $79,215.48 in medical benefits from Purdue's workers' compensation carrier even though he had not applied for those benefits.

On November 17, 2010, the Einhorns filed a complaint against Purdue, 4-H Fair Association, and the Johnsons, alleging that their negligence proximately caused John's injuries. On December 3, 2012, Purdue, 4-H Fair Association, and the Johnsons filed summary judgment motions, and Purdue filed a motion to dismiss for lack of subject matter jurisdiction. The Einhorns filed a memorandum in opposition to summary judgment and a motion to strike an affidavit submitted by Purdue in support of summary judgment. The trial court granted Purdue's motion to dismiss and all three summary judgment motions and denied the Einhorns' motion to strike the affidavit. This appeal ensued.

---

[2] Witnesses testified that John had stepped into Clu's path and had time to get out of Clu's way before the collision, but we must consider the facts in a light most favorable to the Einhorns for purposes of this appeal from summary judgment, and John claims that the horse ran into him and trampled him.

## DISCUSSION AND DECISION

### Issue One:  Subject Matter Jurisdiction

The Einhorns first contend that the trial court erred when it concluded that their complaint against Purdue is barred as a matter of law for lack of subject matter jurisdiction.  The trial court agreed with Purdue that John's acceptance of workers' compensation benefits triggered the exclusivity provision of the Workers' Compensation Act ("the Act").  But the Einhorns maintain that John was not Purdue's employee and, therefore, he is not precluded from bringing this civil action against Purdue.  We must agree with the Einhorns.

> Our supreme court set out the applicable standard of review as follows:
>
> A review of the case authority shows that the standard of appellate review for Trial Rule 12(B)(1) motions to dismiss is indeed a function of what occurred in the trial court.  That is, the standard of review is dependent upon:  (i) whether the trial court resolved disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a "paper record."
>
> * * *
>
> [W]here the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is "in as good a position as the trial court to determine whether the court has subject matter jurisdiction."  MHC Surgical Ctr. Assocs., Inc. v. State Office of Medicaid Policy & Planning, 699 N.E.2d 306, 308 (Ind. Ct. App. 1998).  See also Farner v. Farner, 480 N.E.2d 251, 257 (Ind. Ct. App. 1985) (agreeing with the proposition that "where a case is tried wholly upon documents or stipulations, the appellate tribunal is in as good a position as the trial court to determine the force and effect of the evidence.")  Thus, we review de novo a trial court's ruling on a motion to dismiss where the facts before the court are disputed and the trial court rules on a paper record.

GKN Co. v. Magness, 744 N.E.2d 397, 401 (Ind. 2001). Here, the facts before the court were disputed and the court ruled on a paper record. Accordingly, we review the trial court's grant of Purdue's motion to dismiss de novo.

The Act provides for compensation of injury or death by accident arising out of and in the course of employment. Estate of Smith v. Stutzman, 964 N.E.2d 904, 906 (Ind. Ct. App. 2012). Compensation under the Act is the exclusive remedy for employees under Indiana Code Section 22-3-2-6, which provides:

> The rights and remedies granted to an employee subject to IC 22-3-2 through IC 22-3-6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5-2-6.1.

Indiana Code Section 22-3-6-1(b) defines "employee" to mean "every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation, or profession of the employer."

Here, there is no allegation or designated evidence showing that John was under any contract of hire or apprenticeship with Purdue. Indeed, Purdue makes no contention that John was an employee. Purdue's sole argument on this issue is that John is bound by the exclusivity provision of the Act because he accepted medical payments from Purdue's workers' compensation carrier. In support of that contention, Purdue cites Stutzman, where this court held that, "[o]nce an injured employee accepts or receives compensation under the Act, she concedes that the injury was accidental in nature and that it arose out of and in the course of employment." 964 N.E.2d at 906 (emphasis added). Accordingly,

6

the employee may not later sue her employer in tort based on the same work-related injury. Id.

The undisputed designated evidence shows that John was an unpaid volunteer at the time of the accident with Clu. Further, there is no evidence that John applied for the medical benefits or that he agreed to be bound by the exclusivity provision of the Act by accepting the benefits. We hold on these facts that John's acceptance of medical payments from Purdue's workers' compensation carrier does not change his status from volunteer to employee for purposes of the Act and that John is not bound by the Act's exclusivity provision. The trial court erred when it granted Purdue's motion to dismiss for lack of subject matter jurisdiction.[3]

### Issue Two: Equine Activity Statute

Our standard of review for summary judgment appeals is well established:

> When reviewing a grant [or denial] of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted). The party appealing a summary judgment decision has the burden of

---

[3] It is unclear why, having determined that it lacked subject matter jurisdiction over the Einhorns' claim against Purdue, the trial court nevertheless considered and ruled on the merits of Purdue's summary judgment motion.

7

persuading this court that the grant or denial of summary judgment was erroneous. Knoebel v. Clark County Superior Court No. 1, 901 N.E.2d 529, 531-32 (Ind. Ct. App. 2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter de novo. Crum v. City of Terre Haute ex rel. Dep't of Redev., 812 N.E.2d 164, 166 (Ind. Ct. App. 2004). While we are not bound by the trial court's findings and conclusions and give them no deference, they aid our review by providing the reasons for the trial court's decision. See GDC Envtl. Servs. Inc. v. Ransbottom Landfill, 740 N.E.2d 1254, 1257 (Ind. Ct. App. 2000).

The Einhorns contend that the trial court erred when it concluded that Purdue and 4-H Fair Association are immune from liability under the Equine Activity Statute ("the statute") as a matter of law. The statute, Indiana Code Section 34-31-5-1, provides:

(a) Subject to section 2 of this chapter,[4] an equine activity sponsor or equine professional is not liable for:
    (1) an injury to a participant; or
    (2) the death of a participant;
resulting from an inherent risk of equine activities.

(b) Subject to section 2 of this chapter, a participant or participant's representative may not:
    (1) make a claim against;
    (2) maintain an action against; or
    (3) recover from;
an equine activity sponsor or equine professional for injury, loss, damage, or death of the participant resulting from an inherent risk of equine activities.

---

[4] Indiana Code Section 34-31-5-2 provides exceptions to the statute. While the Einhorns contend for the first time on appeal that one of the exceptions applies, they have waived that argument for failure to raise it to the trial court. See Dunaway v. Allstate Ins. Co., 813 N.E.2d 376, 387 (Ind. Ct. App. 2004).

And Indiana Code Section 34-6-2-69 defines "inherent risks of equine activities" as the dangers or conditions that are an integral part of equine activities, including the following:

> (1) The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around the equine.
> (2) The unpredictability of an equine's reaction to such things as sound, sudden movement, unfamiliar objects, people, or other animals.
> (3) Hazards such as surface and subsurface conditions.
> (4) Collisions with other equines or objects.
> (5) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within the participant's ability.

Here, it is undisputed that Purdue and 4-H Fair Association are both "equine activity sponsors" as defined by Indiana Code Section 34-6-2-42 and that John was a "participant" as defined by Indiana Code Section 34-6-2-95. Further, the Einhorns do not dispute that Purdue and 4-H Fair Association had posted warning signs that complied with Indiana Code Sections 34-31-5-3 and -5.[5] The Einhorns' sole contention on appeal is that John's injuries did not stem from an inherent risk of equine activities. In particular, the Einhorns maintain that the designated evidence shows that Clu "charged at, lowered its head, impacted [John], and trampled [John]." Brief of Appellants at 34. The Einhorns allege that "none of the five risks listed in the Indiana statute encompass" such conduct by a horse. Id. at 35. We cannot agree.[6]

---

[5] Indiana Code Section 34-31-5-5 provides:

The warning notice that must be printed on a sign under section 3 of this chapter and included in a written contract under section 4 of this chapter is as follows: WARNING Under Indiana law, an equine professional is not liable for an injury to, or the death of, a participant in equine activities resulting from the inherent risks of equine activities.

[6] We take exception to the Einhorns' mischaracterization of the designated evidence as showing that "a horse generally stops or veers when a human puts his arms in the air and says: 'Whoa.'" Brief of

In Perry v. Whitley County 4-H Clubs, Inc., 931 N.E.2d 933, 940 (Ind. Ct. App. 2010), this court interpreted the list of inherent risks of equine activities to include injury to a participant when she was "unexpectedly kicked by a horse that became agitated" during a 4-H competition. The horse had become agitated because another horse was standing too close nearby and began sniffing its rear, and to remove the danger to the child handling the other horse, the plaintiff had intervened. Id. We held that two of the listed inherent risks were applicable in Perry, namely, "[t]he unpredictability of an equine's reaction to such things as sound, sudden movement, unfamiliar objects, people, or other animals," and "[t]he propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around the equine." Id. (citing I.C. § 34-6-2-69).

The Einhorns urge us to distinguish Clu's behavior from that of the horse in Perry.[7] And they contend that "none of the five risks listed in the Indiana statute encompass a horse charging at, impacting, and trampling a human being." Brief of Appellant at 35. But the undisputed designated evidence shows that Clu walked away from Renae and Rice, and they were about to catch him when "kids went by with horses and began hollering and yelling 'loose horse' which caused Clu to trot over by the tent with other horses." Johnsons' App. at 249. Clu then "took off." Id.

---

Appellants at 35. The Einhorns cite page 366 of their appendix as support for that statement, but no such support is found there. Rather, that page contains the testimony of a witness who explained that he assesses how a child "gets along with" a horse in terms of the child's ability to control the horse. Appellants' App. at 366. The witness was asked why it is important to control a horse in a 4-H setting, to which he responded, "Because otherwise he's out of control. I mean, if he won't stop when you say, 'Whoa,' you know, and he won't guide, then you can't do anything with him." Id. Nothing in that testimony refers to a bystander putting his hands in the air and saying "whoa."

[7] We decline the Einhorns' invitation to consider case law from other jurisdictions.

10

When John saw Clu running around the grounds, he exited his vehicle and told his son to stay inside the vehicle. John testified that "[t]here was a lot of commotion. . . . [W]hen a horse is moving that fast, you know, people clear out." Purdue's App. at 38. John also testified that he knew horses to be "unpredictable" and to "have a mind of their [sic] own." Id. at 25. Assuming for purposes of summary judgment that John was merely standing still and that Clu ran into him and trampled him while running loose, we hold that Clu's behavior falls into more than one category of inherent risks under the statute, namely: the propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around the equine; the unpredictability of an equine's reaction to such things as sound, sudden movement, unfamiliar objects, people, or other animals; and the potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within the participant's ability. See I.C. § 34-6-2-69.

As we have noted in footnote 4, above, the Einhorns have waived their allegation that one of the exceptions to the immunity statute applies. Accordingly, the Einhorns' negligence claims against Purdue and 4-H Fair Association are precluded because John's injuries resulted from inherent risks of equine activities. See Perry, 931 N.E.2d at 939. The trial court did not err when it entered summary judgment in favor of Purdue and 4-H Fair Association on that basis.[8]

---

[8] Because we affirm the trial court's entry of summary judgment based on the Equine Activity Statute, we need not address whether Purdue is immune from liability under the Indiana Tort Claims Act ("ITCA"). Likewise, we need not address whether the trial court abused its discretion when it denied the Einhorns' motion to strike an affidavit relied upon in support of the ITCA defense.

**Issue Three:  The Johnsons**

Finally, the Einhorns contend that the trial court erred when it entered summary judgment in favor of the Johnsons.  The Einhorns maintain that the Johnsons were negligent because, after they were informed that Clu had bucked Renae to the ground three times, the Johnsons "had enough time to remove the horse from the fairgrounds before the horse ran loose from Renae."  Brief of Appellants at 39.  But the Johnsons claim that Clu did not have any dangerous propensities of which they knew or should have known at the time John was injured.

In order to prevail on a claim of negligence, a plaintiff is required to prove:  (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach.  Pickering v. Caesars Riverboat Casino, LLC, 988 N.E.2d 385, 389 (Ind. Ct. App. 2013).  In negligence cases, summary judgment is rarely appropriate.  Id.  This is because negligence cases are particularly fact-sensitive and are governed by a standard of the objective, reasonable person—one best applied by a jury after hearing all of the evidence.  Id.  Nevertheless, a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim.  Id.

As we explained in Forrest v. Gilley, 570 N.E.2d 934, 935 (Ind. Ct. App. 1991), trans. denied:

> Horses are domestic animals.  Klenberg v. Russell, (1890), 125 Ind. 531, 534, 25 N.E. 596, 597.  The owner of a domestic animal is not liable for injuries caused by the animal unless the animal had dangerous propensities known, or which should have been known, to the owner.  Burgin v. Tolle, (1986), Ind. App., 500 N.E.2d 763; Doe v. Barnett, (1969), 145 Ind. App. 542, 251 N.E.2d 688.  A dangerous propensity is "a propensity or tendency

12

of an animal to do any act which might endanger the safety of person or property in a given situation." Weaver v. Tucker (1984), Ind. App., 461 N.E.2d 1159, 1161 (citation omitted). If an individual animal lacks dangerous propensities, "the rule is simply that the owner of a domestic animal is bound to know the natural propensities of the particular class of animals to which it belongs." Burgin, supra, 500 N.E.2d at 766. In either event, the owner must exercise reasonable care to guard against the propensities and to prevent injuries reasonably anticipated from them. Borton v. Lavenduskey, (1985), Ind. App., 486 N.E.2d 639, reh'g. denied, 488 N.E.2d 1129, trans. denied. Thus, Forrest, as a horse owner, owed a duty of reasonable care to prevent any injuries Gilley might suffer as a result of the horse's dangerous propensities or, in the absence of dangerous propensities, from the horse's class propensities.

Here, the trial court found that "a one[-]time event such as this (a spooked horse in an unaccustomed environment causing two falls within a few minutes) is quite certainly not a dangerous propensity[.]" Appellants' App. at 15. But the Einhorns contend that Clu's bucking Renae is evidence of a dangerous propensity. In support of that contention, the Einhorns cite Forrest, where we observed that "Indiana courts have not had previous occasion to rule on the dangerous propensities required to be shown in a case of a plaintiff's fall from a horse." 570 N.E.2d at 935. Accordingly, we listed the "common sense results" reached by courts in other jurisdictions, including Missouri, where the Court of Appeals held that, because the defendant had knowledge of his horse's propensity to buck, there was a genuine issue of material fact whether he owed a duty to give the bucked-off plaintiff notice of that propensity. Heald v. Cox, 480 S.W.2d 107, 111 (Mo. Ct. App. 1972).

In Heald, the court explained the bucking tendencies of the defendant's horse as follows:

Defendant bought the quarter horse in question, named Little Gal, in March or April, 1968. The third time the defendant rode Little Gal after the

13

purchase, the horse "bucked like nobody's business." However, defendant managed to get the horse under control on that occasion and was not thrown. Afterwards, defendant rode Little Gal on various occasions and noticed that she "tensed up" but she never again bucked because defendant "didn't give her a chance to."

Between the Spring of 1968 when the horse was acquired, and October 6, 1968, when plaintiff's accident occurred, Little Gal was also ridden by defendant's wife, his son Robert, and his fourteen[-]year[-]old grandson Leon. These family members were all more experienced riders than plaintiff, but defendant, nevertheless, warned them "to watch her and not let her get her head or she would buck." Robert Cox testified that although Little Gal gave him no particular problem, she was "a spirited horse."

Id. at 110. Thus, the evidence in Heald showed that the horse had a tendency to buck and that the defendant was well aware of that tendency prior to the plaintiff being bucked from the horse.

Here, however, the undisputed designated evidence shows that Clu was in an unfamiliar practice arena when he bucked in response to a specific external stimulus, namely, a nearby truck backing up and sounding an alarm. There is no evidence that Clu had ever shown any tendency to buck prior to that time, nor is there any evidence that Clu had demonstrated any dangerous propensities of any kind prior to that time. We agree with the trial court and hold that Clu's bucking Renae off under the circumstances is not evidence of a dangerous propensity as a matter of law. Accordingly, the Einhorns cannot show that the Johnsons breached a duty of care, and the Johnsons are entitled to summary judgment on the Einhorns' negligence claims.[9]

---

[9] We note that the Einhorns make no contention that John's injuries stemmed from a failure by the Johnsons to exercise care to guard against any natural propensities of horses. See Forrest, 570 N.E.2d at 935.

14

## Conclusion

Because John was not Purdue's employee at the time of the accident, his negligence claim against Purdue is not barred by the exclusivity provision of the Workers' Compensation Act. Purdue and 4-H Fair Association are entitled to summary judgment as a matter of law under the Equine Activity Statute. And the Johnsons are entitled to summary judgment as a matter of law because they did not know or have reason to know that Clu had any dangerous propensities prior to the accident.

Affirmed in part and reversed in part.

MATHIAS, J., and BROWN, J., concur.

15