

**FILED**

Mar 23 2017, 8:31 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Donald E. Morgan
Lynne D. Hammer
Kathryn M. Box
Office of Corporation Counsel
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

John F. Townsend, III
Townsend & Townsend, LLP
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Hoosier Mountain Bike Association, Inc., City of Indianapolis, and Indy Parks and Recreation,[1] | March 23, 2017 |
| *Appellants-Defendants,* | Court of Appeals Case No. 49A04-1604-CT-865 |
| v. | Appeal from the Marion Superior Court |
| Richard Kaler, | The Honorable Cynthia J. Ayers, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49D04-1209-CT-35642 |

**Riley, Judge.**

---

[1] On February 23, 2017, Hoosier Mountain Bike Association, Inc. filed a notice of settlement with Richard Kaler and, as part of the settlement, dismissed this appeal. Accordingly, Hoosier Mountain Bike Association, Inc. is no longer a party in this cause. We will still include facts with respect to the Hoosier Mountain Bike Association, Inc. where necessary for our decision.

# STATEMENT OF THE CASE[2]

Appellants-Defendants, the City of Indianapolis and Indy Parks and Recreation (the City),[3] appeal the trial court's denial of their motion for summary judgment with respect to Appellee-Plaintiff's, Richard Kaler (Kaler), claims of negligence after Kaler sustained injuries in riding the City's mountain bike trail at Town Run Trail Park.

We reverse.

# ISSUES

The City presents us with four issues on appeal, which we consolidate and restate as follows:

(1) Whether a genuine issue of material fact precluded the entry of summary judgment on Kaler's claim of premises liability; and

(2) Whether a genuine issue of material fact precluded the entry of summary judgment based on the City's claim that Kaler was contributorily negligent.

---

[2] We held oral argument in this cause on March 7, 2017, in the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank both counsel for their advocacy.

[3] For all practical purposes, Appellant is the City of Indianapolis as the City's Indy Parks and Recreation department cannot be sued outside the Access to Public Records Act context. *See City of Perry v. Lewis*, 950 N.E.2d 1, 4 (Ind. Ct. App. 2011) (noting that units of local government, but not their individual departments, are suable under Indiana law), *trans. denied*.

# FACTS AND PROCEDURAL HISTORY

[4] The City of Indianapolis owns and operates the Town Run Trail Park through its Indy Parks and Recreation department. The Hoosier Mountain Bike Association, Inc. (HMBA) is responsible for maintaining the trails, which have a difficulty rating from beginner through intermediate. In the spring of 2011, an Eagle Scout, as part of his merit badge project, built a new technical trail feature along Town Run's mountain bike trail. The feature can best be described as a banked wooden turn, also known as a berm. A rider, approaching the berm, has three options for completing the turn. First, riders can avoid the berm by staying on the dirt path on its left side. Second, riders can elect to enter the berm and ride it on the low grade, or third, riders can negotiate the turn by riding the berm's more challenging high grade. The entrance onto the wooden turn is fully tapered with the ground, while the exit is only partially tapered. A rider choosing the low grade would exit the berm with a "little jump" off the end of the feature. (City's App. Vol. II, pp. 100-01). A rider exiting on the high grade would have to make a two-foot jump back down to the trail.

[5] By July 9, 2011, Kaler had been mountain biking for approximately four to five years. He described himself as an "experienced" and "better than average" bicyclist. (City's App. Vol. II, pp. 90, 91). Although he was familiar with the trails at Town Run, he had not been on the mountain bike trail since the berm had been constructed several months earlier. "Oftentimes," Kaler would "try to get an idea of the technical requirements of the trail" and would step off his bike, especially if he saw something within his view "as a danger." (City's App.

Vol. II, p. 89). He understood that "on a mountain bike trail there's multiple paths that you can take, one being more dangerous or less dangerous than another." (City's App. Vol. II, p. 89). In fact, Kaler had ridden a "fairly sophisticated" trail before which had a "four or five foot drop." (City's App. Vol. II, pp. 95, 96). While riding a mountain bike, Kaler was "never [] a casual rider. [He] always enjoyed the obstacles[.]" (City's App. Vol. II, p. 100). He "expected to get in a wreck at least every other time [he] rode, and [he] would routinely fall off the bike over obstacles." (City's App. Vol. II, p. 95). "[I]t was just a general consequence of the sport." (City's App. Vol. II, p. 95).

[6] On July 9, 2011, Kaler and his girlfriend took their first trip on the trail. The mountain bike trail is shaped as a "figure 8," with an approximate length of 6 miles. (City's App. Vol. II, p. 92). When he first approached the berm, Kaler "took the low grade" on the feature. (City's App. Vol. II, p. 95). As he approached the end of the turn, Kaler could see "there was a drop" so he "pull[ed] up on the fork and [did] a little bunny hop[.]" (City's App. Vol II, pp. 102, 101). On their second trip around the course, Kaler's girlfriend decided to take a shorter loop back to the trailhead. She was not as "adventurous" as Kaler and was concerned about getting back to the trailhead before dusk. (City's App. Vol II, p. 92). Despite the approaching darkness, Kaler "wanted to ride the higher grade because [he] knew it was more challenging." (City's App. Vol. II, p. 101). He reached the berm again around 9:30 p.m. Feeling "capable of riding that high line," Kaler sped up and rode the berm "as high as [he] could possibly ride it with [his] skill set." (City's App. Vol. II, p. 101). As he was

near the end of the berm's high grade, he "just saw [him]self lose control [] and just knew he was dropping." (City's App. Vol. II, p. 101). Kaler "didn't see the drop, [nor] was he aware of the drop" at the end of the high grade turn, instead he "thought it tapered off." (City's App. Vol. II, p. 104). Due to the fall, Kaler sustained lacerations to his spleen and kidney. After calling his mother and girlfriend to inform them that he had crashed, he rode his bicycle back to the trail head. That evening, Kaler and his girlfriend went out for dinner.

[7] Around 1:30 a.m. on the following morning, Kaler went to the hospital where he was diagnosed with lacerations to his spleen and kidney. On discharge, Kaler was offered physical therapy but refused it because he "didn't feel it was necessary." (City's App. Vol. II, p. 99). Kaler's recovery did not last long and he participated in a 100-mile bicycle ride later that summer.

[8] On September 7, 2012, Kaler filed his Complaint against the City, sounding in premises liability. On August 21, 2015, the City filed its motion for summary judgment. (City's App. Vol II, p. 46). In turn, Kaler submitted his response to the City's motion, as well as his designation of evidence. On January 6, 2016, the trial court conducted a hearing on the City's motion for summary judgment. On February 2, 2016, the trial court issued its Order, summarily denying the motion. The trial court certified its Order for interlocutory appeal and the City sought this court's permission to appeal. We granted the request and accepted the interlocutory appeal on May 19, 2016.

[9] Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . . , or if the undisputed facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009).

In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary

judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

[12] We observe that in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight unto the trial court's rationale for its review and facilitate appellate review. *Id.*

## II. *Premises Liability*

[13] In support of its argument that the trial court erred in denying its motion for summary judgment, the City relies on *Burrell v. Meads*, 569 N.E.2d 637 (Ind. 1991), and *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011). In *Burrell*,[4] Indiana's seminal case for premises liability, our supreme court imposed a

---

[4] We acknowledge that on October 26, 2016, our supreme court redrew the premises liability landscape with its decision in *Rogers v. Martin*, 63 N.E.3d 316, 321 (Ind. 2016), in which the court issued a new test with respect to the situation where an invitee's injury occurs not due to a dangerous condition of the land but due to claims involving activities on the land. In *Rogers*, our supreme court distinguished *Burrell* as follows:

> When a physical injury occurs as a condition of the land, the three elements described in the Restatement (Second) of Torts Section 343 accurately describe the landowner-invitee duty. And because *Burrell* involved an injury due to a condition on the land, it accordingly framed the landowner-invitee duty broadly. [] [W]hile Section 343 limits the scope of the landowner-invitee duty in cases involving injuries due to conditions of the land, injuries could also befall invitees due to activities on a landowner's premises unrelated to the premises' condition—and that landowners owe their invites the general duty of reasonable care under those circumstances too.

*Rogers*, 63 N.E.3d at 322-23. Because Kaler's injury occurred when riding a mountain bike trail feature, we find the cause more properly analyzed pursuant to *Burrell* as it involved a condition of the land.

three-part test to determine a landowner's liability for harm caused to an invitee[5] by a condition of its land. Under the *Burrell* test, a landowner can be held responsible only if the landowner:

(a) Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) Should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) Fails to exercise reasonable care to protect them against the danger.

*Burrell*, 569 N.E.2d at 639-40.

[14] On May 18, 2011, our supreme court issued *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011), which applied the *Burrell* test in the realm of premises liability while participating in sports activities. In *Pfenning*, Cassie Pfenning was injured by a golf ball at a golf outing when she was sixteen years old. *Id.* at 396. At the time of the incident, Pfenning drove a beverage cart and after making several trips around the golf course "was suddenly struck in the mouth by a golf ball while driving the beverage cart on the cart path approaching the eighteenth hole's tee pad from its green." *Id.* at 397. The ball was a low drive from the sixteenth tee approximately eighty yards away. *Id.* The golfer's drive traveled

---

[5] All parties agree that Kaler is an invitee of the City.

straight for approximately sixty to seventy yards and then severely hooked to the left. *Id.* The golfer noticed the roof of another cart in the direction of the shot and shouted "fore." *Id.* But neither the plaintiff nor her beverage-serving companion heard anyone shout "fore." *Id.* After hearing a faint yelp, the golfer ran in the direction of the errant ball and discovered the plaintiff with injuries to her mouth, jaw, and teeth. *Id.*

[15] Pfenning brought, among others, a premises liability claim against the Elks, the fraternal lodge that owned and operated the golf course. *Id.* at 405. Finding that the injury arose from a condition on the premises, the supreme court turned to *Burrell* in its articulation of the contours of the Elks' duty. *Id.* at 406. In applying the *Burrell* test, the court held that the two first aspects of premises liability were not established by the designated evidence. *Id.* at 407. First, turning to the second element—the discovery or realization of danger—the court concluded that "for the purpose of our premises liability jurisprudence, the issue here is [] whether the Elks objectively should have expected that [Pfenning] would be oblivious to the danger or fail to protect herself from it." *Id.* at 406. In applying this principle the court found "no genuine issue of fact to contravene the objectively reasonable expectation by the Elks that persons present on its golf course would realize the risk of being struck with an errant golf ball and take appropriate precautions." *Id.* Addressing *Burrell*'s first element—unreasonable risk of harm—the *Pfenning* court reasoned that "the risk of a person on a golf course being struck by a golf ball does not qualify as the

'unreasonable risk of harm' referred to in the first two components of the *Burrell* three-factor test." *Id*.

[16] Likewise, here, we conclude that the designated evidence does not satisfy the *Burrell* requirements with respect to the duty component of premises liability. Initially, we find that it was objectively reasonable for the City under the facts of this case to expect Kaler to appreciate the risks of riding the trail and take suitable protections. The trail's difficulty was advertised as appropriate for beginner through intermediate. Kaler's own deposition characterized himself as an "experienced" bicyclist, who had ridden "a fairly sophisticated" trail before and who "always enjoyed the obstacles." (City's App. Vol. II, pp. 91, 95, 100). He conceded that to "try to get an idea of the technical requirements of the trail," he would get off his bike, especially if he noticed something "as a danger." (City's App. Vol. II, p. 89). He admitted that a fall "was just a general consequence of the sport." (City's App. Vol. II, p. 95). Although he had ridden the trail the first time without any problems, when Kaler decided to make a second run, it was getting dark but he was insistent that he "wanted to ride the higher grade because [he] knew it was more challenging." (City's App. Vol. II, p. 101). At no point did Kaler step off his bike and inspect the berm's high grade prior to riding it in the approaching darkness. Accordingly, pursuant to Kaler's own statements, the City could objectively and reasonably have expected an experienced bicyclist to realize the risks a beginner to intermediate trail would present and take appropriate precautions.

[17] We also conclude that the designated evidence fails to establish that the City had actual or constructive knowledge of a condition on the trail that involved an unreasonable risk of harm to Kaler. Kaler's own deposition unequivocally affirms that being involved in a bicycle crash "was just a general consequence of the sport." (City's App. Vol. II, p. 95). In fact, Kaler "expected to get in a wreck at least every other time [he] rode, and [he] would routinely fall off the bike over obstacles." (City's App. Vol. II, p. 95). As the expectation of a bicycle crash is a risk inherent to riding trails, it cannot serve to establish the sort of unreasonable risk of harm contemplated in the first Burrell element. *See Pfenning*, 947 N.E.2d at 407.

[18] Finding that the designated evidence conclusively established that two of the elements of the premises liability test are not satisfied, we conclude that the trial court erred by denying summary judgment to the City. We reverse the trial court's decision and now find summary judgment for the City.

## II. *Contributory Negligence*

[19] Next, the City maintains that Kaler is foreclosed from any recovery because of his failure to exercise the care a reasonable, prudent mountain biker should have exercised. It should be noted that Kaler brought his claim against the City, a governmental entity, and therefore, his claim falls under the common law defense of contributory negligence, as the Indiana Comparative Fault Act expressly excludes application to governmental entities. *See* I.C. § 34-51-2-2. Consequently, even a slight degree of negligence on Kaler's part, if proximately

contributing to his claimed damages, will operate as a total bar to his action for damages against the City, even though, as against non-governmental defendants, any fault of Kaler would only operate to reduce the damages he might obtain.

[20] A plaintiff is contributorily negligent when the plaintiff's conduct "falls below the standard to which he should conform for his own protection and safety." *Funston v. School Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006). Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends. *Id*. Expressed another way, "[c]ontributory negligence is the failure of a person to exercise for his own safety that degree of care and caution which an ordinary, reasonable, and prudent person in a similar situation would exercise." *Id*. at 599. Contributory negligence is generally a question of fact and is not an appropriate matter for summary judgment "if there are conflicting factual inferences." *Id*. "However, where the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of law." *Id*.

[21] In *Funston*, the plaintiff sued the school after incurring injuries caused by a fall when he leaned backwards while sitting on the top row of a set of bleachers. *Id*. at 599. Funston had been at the gym for about four hours, watching two basketball games while sitting on lower rows on other sets of identical bleachers. *Id*. For the third game, he moved to the top row of one of the bleachers. *Id*. It was clearly visible that there was no back railing for spectators

sitting on the top row, but Funston leaned back anyway because he "thought there was something back there[.]" *Id*. Our supreme court concluded that Funston was contributorily negligent as a matter of law, finding that:

> It certainly is understandable that [Funston] would be distracted as he engaged his attention on his son's basketball game. But being understandable does not equate with being completely free of all negligence.

*Id*. at 600.

[22] In his deposition, Kaler affirmed that in trying to build a skill, it would not be unusual for him "to get off [his] bike and look at the [] obstacles." (City's App. Vol. II, p. 89). He also acknowledged that he knew the berm's high grade would be challenging because he had just started riding high berms and had never ridden a berm as steep as the one at Town Run. As he approached the end of the turn during his first ride on the berm, Kaler could see "there was a drop[.]" (City's App. Vol. II, p. 103). After a successful first run on the berm's low grade, Kaler decided to ride the feature again. Despite the approaching darkness, he planned to ride the berm's high grade as high as he possibly could because it would be "really cool to ride it and get that speed[.]" (City's App. Vol. II, p. 101). Notwithstanding the coolness factor, Kaler conceded that riding obstacles posed a risk of bodily injury as crashes were a general consequence of the sport. Typically, to get an idea of the technical requirements of a trail, the biker "would get off his bike." (City's App. Vol. II, p. 89).

[23] Based on the designated evidence, we cannot conclude that Kaler was "completely free of all negligence." *See id*. Kaler knew and understood the precautions a reasonably prudent mountain biker should take—inspect the feature prior to riding it—but chose not to follow them. There is no evidence that the jump from the high grade was obscured from view and Kaler conceded that he could have anticipated the drop from the high grade had he taken the precaution a reasonable bicyclist riding an unfamiliar trail would take. Accordingly, we find Kaler contributorily negligent.

## CONCLUSION

[24] Based on the foregoing, we hold that there is no genuine issue of material fact that precludes the entry of summary judgment in the City's favor on Kaler's claim of premises liability; and Kaler was contributorily negligent when riding the City's mountain bike trail at Town Run.

[25] Reversed.

[26] Crone, J. and Altice, J. concur