

FILED

May 05 2020, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Duke T. Escue
Hilary Ruth Hall
Walter J. Alvarez
Walter J. Alvarez, P.C.
Crown Point, Indiana

ATTORNEY FOR APPELLEE

Robert F. Ahlgrim, Jr.
State Auto Insurance House
Counsel
Carmel, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kathleen Burdick and Bruce Burdick, Individually, and as Husband and Wife, <br><br> *Appellants-Plaintiffs,* <br><br> v. <br><br> Julie Romano, <br><br> *Appellee-Defendant.* | May 5, 2020 <br><br> Court of Appeals Case No. 19A-CT-2739 <br><br> Appeal from the Lake Circuit Court <br><br> The Honorable Marissa J. McDermott, Judge <br><br> Trial Court Cause No. 45C01-1310-CT-152 |

**Kirsch, Judge.**

[1]     Kathleen Burdick ("Burdick") and Julie Romano ("Romano") were riding their horses in a horse arena when Burdick fell and suffered serious injuries. Burdick and her husband Bruce Burdick sued Romano, and the jury returned a verdict for Romano. Burdick raises four issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion by refusing to read jury instructions on negligence;

II. Whether the trial court abused its discretion by reading a jury instruction on inherent risks of equine activities; and

III. Whether the trial court abused its discretion by reading a jury instruction on incurred risk.

We affirm.

## Facts and Procedural History

Romano was renting and living on a property in Lowell, Indiana, which she called "Serenity Farms." *Tr. Vol. 2* at 111. On October 31, 2011, Burdick, and her friend, Kathy Jacobsma ("Jacobsma"), took Burdick's horse Chip to Serenity Farms for boarding and training. *Tr. Vol. 3* at 228-32. Burdick is an expert in horse training and riding. *Id.* at 219-20; *Tr. Vol. 4* at 59, 61. Burdick came to Serenity Farms almost every day to train Chip in the horse arena. *Tr. Vol. 3* at 231. The arena was specifically and exclusively designed for horse riding and training. *Tr. Vol. 4* at 66. It was not designed or used for any other purpose, such as providing a venue for cattle shows. *Id.*

Chip was a gelded, laid back, and lazy horse. *Tr. Vol. 3* at 223. Romano's horse Sheza was aggressive and known for kicking other horses. *Id.* at 239. Burdick was aware that Sheza had a history of kicking other horses and had witnessed Sheza kick other horses. *Id.* Romano acknowledged that Sheza was aggressive, posting a picture of Sheza on Facebook and stating: "[I] love love

love this pic! It's a classic Sheza pic! Ears pinned back and everything. My pretty moody bitch! Haha! Gotta love her!" *Tr. Vol. 2* at 132-33.

[5] On November 5, 2011, Burdick and Jacobsma went to Serenity Farms to ride horses in a pasture with Romano. *Id*. 241-42; *Tr. Vol. 3* at 235-36. Romano warned Burdick and Jacobsma several times to stay away from Sheza because Sheza tended to back up and kick other horses. *Tr. Vol. 2* at 247; *Tr. Vol. 3* at 239.

[6] Three days later, on November 8, 2011, Burdick returned to Serenity Farms and began to ride Chip in the arena. *Tr. Vol. 3* at 240-41. Soon thereafter, Romano entered the arena with Sheza and set up poles, and Burdick and Romano began to ride their horses around the poles. *Id*. at 241-43. Burdick then demonstrated to Romano how desensitized and laid-back Chip was by dismounting Chip, taking off her hoodie, and placing her hoodie over Chip's head. *Id*. at 243. Chip remained calm. *Id*. Burdick then got back on Chip, and she and Romano began riding their horses around the perimeter of the arena. *Id*. at 244. About two minutes later, Romano stopped and dismounted Sheza. *Id*. Burdick was approximately twelve feet behind Sheza and still sitting on Chip. *Id*. Burdick assumed that Romano was just going to tighten Sheza's saddle, but Romano dropped Sheza's reins and walked away from Sheza without tying her up. Romano headed to the southwest corner of the arena, where there was a barrel that she intended to retrieve to show Burdick a trick in which Sheza would push the barrel with her nose as Romano was riding her. *Tr. Vol. 2* at 137; *Tr. Vol. 3* at 244-45.

[7] Burdick testified that as Romano returned with the barrel, Sheza spooked and suddenly started to back up, with Sheza's rear end coming directly towards Burdick and Chip. *Tr. Vol. 3* at 245. Burdick testified that she "saw two feet hit, felt a blow under her chin, and then everything went black." *Id*. Burdick testified that this happened so quickly that she did not have time to react or take evasive maneuvers. *Tr. Vol. 4* at 69-70.

[8] At trial, Romano provided a different account. She testified that she walked Sheza to the location of the barrel and continued to hold Sheza's reins. *Tr. Vol. 2* at 142-43. Burdick was located approximately forty feet away, when Chip executed a right turn, and then abruptly stopped, causing Burdick to lose her balance and fall off Chip. *Id*. at 143-45.

[9] Burdick was in the hospital almost one month to recover from her injuries, which included a broken shoulder and a brain injury. *Tr. Vol. 3* at 248; *Tr. Vol. 4* at 24-26, 70-71. Once released from the hospital, Burdick went through outpatient therapy for eight months. *Tr. Vol. 3* at 248; *Tr. Vol. 4* at 5. Eventually, Burdick was awarded Social Security Disability due to her injuries from the incident. *Tr. Vol. 4* at 28.

[10] On February 24, 2014, Burdick filed an amended complaint, alleging that Romano was negligent, grossly negligent, and reckless in her care and control

of Sheza. *Appellant's App. Vol. II* at 24-29.[1] Romano filed two motions for summary judgment, and the trial court denied both motions, finding in its denial of Romano's second motion for summary judgment that the "present case alleges a personal injury arising out of a horse-related *sports activity*." *Appellee's Appendix Vol. 2* at 2 (emphasis added). Burdick later filed a motion in limine to exclude testimony that Burdick and Romano were sports participants engaged in a sporting event at the time of the incident or that Burdick had incurred any risk of injury. *Appellant's App. Vol. II* at 54-66. On October 18, 2019, the trial court denied Burdick's motion in limine. *Id*. at 113.

[11] Meanwhile, on October 17, 2019, Burdick had tendered proposed final jury instructions, which included instructions on premises liability, duty, negligence, and reasonable care. *Appellant's App. Vol. II* at 87-90. That same day, Burdick tendered the following proposed final instruction:

> Horses are domestic animals. The owner of a domestic animal is not liable for injuries caused by the animal unless the animal had dangerous propensities known, or which should have been known, to the owner. A dangerous propensity is a propensity or predictable tendency of an animal to do any act which might endanger the safety of person or property in a given situation. An owner must exercise reasonable care to guard against a

---

[1] The amended complaint also named Joseph R. Verbeek ("Verbeek") and Christy L. Marcotte ("Marcotte") as defendants. *Appellant's App. Vol. II* at 24. The amended complaint alleged that Verbeek and Marcotte operated Serenity Farms, a business that boarded, managed, and trained horses, and that Romano was an employee of Serenity Farms. *Id*. at 24-25. On June 22, 2017, Verbeek and Marcotte were dismissed from the case with prejudice. *Id*. at 7.

known dangerous propensity or a known predictable tendency, and to prevent injuries reasonably anticipated from them.

*Id.* at 91.

[12] On October 20, 2019, Romano tendered a proposed instruction that alleged Burdick was required to prove that Romano was reckless. *Appellant's App. Vol. II* at 131-33. Romano also tendered other proposed final jury instructions, which included a modification of the "sporting event injury" pattern instruction, that also required Burdick to show that Romano was reckless. *Id.* at 115, 117-18. On October 21, 2019, Burdick filed a proposed preliminary instruction that the jury needed to find that Romano knew, or should have known, that Romano's own Sheza had known dangerous propensities, and a known tendency to kick other horses, and that Romano had failed to use reasonable care to protect Burdick from Sheza. *Id.* at 140-42.

[13] The case proceeded to jury trial on October 28, 2019. *Id.* at 18-23. The trial court refused to read Burdick's final instructions on premises liability, negligence, duty, and reasonable care. *Tr. Vol. 4* at 138-44, 200. The trial court then read Romano's proposed instructions on incurred risk, inherent risks of equine activities, and sporting event injuries. *Id.* at 199-200. The jury returned

a verdict in favor of Romano.[2] *Appellant's App. Vol. II* at 23. Final judgment was entered on October 31, 2019. *Id*. at 21. Burdick now appeals.

## Discussion and Decision

[14] Burdick argues that the trial court abused its discretion when it instructed the jury. First, she argues the trial court should have read her proposed instructions on negligence to the jury. Second, she contends the trial court should not have read Romano's instructions on the inherent risks of equine activities, sporting event injuries, and incurred risk.

[15] The manner of instructing a jury is left to the trial court's discretion. *Kimbrough v. Anderson*, 55 N.E.3d 325, 339 (Ind. Ct. App. 2016), *trans. denied*. We consider whether: (1) the instruction correctly states the law; (2) the record contains evidence to support the instruction; and (3) the substance of the tendered instruction is covered by the other instructions that are given. *Id*. An instruction is properly rejected if it could mislead or confuse the jury. *Miller v. Ryan,* 706 N.E.2d 244, 248 (Ind. Ct. App. 1999), *trans. denied*.

[16] To determine whether sufficient evidence exists to support an instruction given by the trial court, we look only at the evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom. *Foddrill v. Crane,* 894 N.E.2d 1070, 1078 (Ind. Ct. App. 2008), *trans. denied.* When a jury is given an

---

[2] The jury assigned fault for Burdick's injuries as follows: Burdick, 65%, and Romano, 35%. *Appellant's App. Vol. II* at 23.

incorrect instruction, we will not reverse the judgment unless the party seeking a new trial shows a reasonable probability that its substantial rights were adversely affected. *Kimbrough*, 55 N.E.3d at 339.

# I. Negligence Instructions

Burdick argues the trial court abused its discretion in refusing to read her instructions on negligence, duty, and reasonable care because, she claims, this is a simple negligence case. She likens her law suit to a "dog bite" case, where "the owner of a dog, with known dangerous propensities, has a duty of reasonable care to warn others, and to keep the dog on a leash and/or to tie the dog up and/or to lock the dog up." *Appellants' Amended Br.* at 12. *See, e.g., Ross v. Lowe*, 619 N.E.2d 911, 914 (Ind. 1993) ("[T]he owner of a dog is bound to know the natural propensities of dogs, and if these propensities are the kind which reasonably might be expected to cause injury, the owner must use reasonable care to prevent such injuries from occurring."). Because the evidence shows that Romano knew that Sheza had exhibited dangerous propensities, i.e., Sheza's history of kicking other horses, and that Romano failed to exercise reasonable care by failing to tie up Sheza once she dismounted Sheza, Burdick claims the evidence supported instructing the jury on negligence.

Burdick draws our attention to two cases involving injuries caused by a horse, *Einhorn v. Johnson*, 996 N.E.2d 823 (Ind. Ct. App. 2013), *trans. denied*, and *Heald v. Cox*, 480 S.W.2d 107 (Mo. Ct. App. 1972), a Missouri case discussed by

*Einhorn*. In *Einhorn*, a volunteer at the Marshall County 4-H Fairgrounds got out of a vehicle to stop a runaway horse but was trampled by the horse. *Einhorn*, 996 N.E.2d at 825-26. In *Heald*, a party guest sued the party host for injuries the guest sustained when he was thrown from a horse the party host had provided to the guest. *Heald*, 480 S.W.2d at 110. Both cases stand for the proposition that a person who owns a horse that has known dangerous propensities must exercise reasonable care to prevent injuries reasonably anticipated from those dangerous propensities. *Einhorn*, 996 N.E.2d at 831; *Heald*, 480 S.W.2d at 111. Because *Einhorn* and *Heald* addressed these horse-caused injuries within the context of negligence, Burdick contends that her case against Romano for injuries caused by Sheza is also a negligence case, so the trial court abused its discretion by not instructed the jury accordingly.

[19] The trial court rejected this reasoning even before this case went to trial. Even though the trial court denied Romano's second motion for summary judgment, it nonetheless ruled that *Einhorn* did not apply, stating, "The court declines to find *Einhorn . . .* applicable here. While [Burdick] relies upon that case, *it does not involve a sports participant* or spectator but, instead, a bystander attempting to corral a loose horse." *Appellee's App. Vol. 2* at 6 n.2 (emphasis added). At trial, the trial court reaffirmed its conclusion that this was a sports-activity case. *Tr. Vol. 2* at 74; *Tr. Vol. 4* at 141.

[20] A person need not participate in a competitive sport to be engaged in a sporting activity. *Gyuriak v. Millice*, 775 N.E.2d 391, 395 (Ind. Ct. App. 2002), *disapproved on other grounds by Pfenning v. Lineman*, 947 N.E.2d 392, 400-01 (Ind.

2011), *trans. denied*. Thus, activities our courts have categorized as sporting

activities include non-competitive golf,[3] a person riding a mountain bike while

alone on a bike trail,[4] and practicing karate kicks during a karate class.[5]

[21]    Burdick contends that she and Romano were not engaged in a sporting event.

Burdick raises this argument as a separate, stand-alone issue, claiming that the

trial court abused its instruction by reading the "sporting event pattern jury

instruction." *Appellants' Amended Br*. at 39-44. However, the crux of Burdick's

argument about the sporting event instruction is that Burdick and Romano were

not engaged in a sporting event under the terms of the equine activity statutes,

*see* Indiana Code chapter 34-31-5, *et. seq*., and specifically under the statute that

defines "equine activity," Indiana Code section 34-6-2-41. Therefore, we will

address Burdick's argument within the context of those statutes.

[22]    Indiana Code section 34-6-2-41 defines "equine activity" as follows:

> (a) "Equine activity," for purposes of IC 34-31-5, *includes* the
> following:
>
> (1) Equine shows, fairs, competitions, performances, or parades
> that involve equines and any of the equine disciplines, including
> dressage, hunter and jumper horse shows, grand prix jumping,
> three (3) day events, combined training, rodeos, driving, pulling,

---

[3] *See Pfenning v. Lineman*, 947 N.E.2d 392, 406 (Ind. 2011) and *Gyruiak v. Millice*, 775 N.E.2d 391, 395 (Ind. Ct. App. 2002), *disapproved on other grounds by Pfenning*, 947 N.E.2d at 404), *trans. denied*.

[4] *See Hoosier Mountain Bike Ass'n, Inc. v. Kaler*, 73 N.E.3d 712, 714-15 (Ind. Ct. App. 2017).

[5] *See Megenity v. Dunn*, 68 N.E.3d 1080, 1082 (Ind. 2017).

cutting, polo, steeplechasing, English and western performance riding, endurance trail riding and western games, and hunting.

(2) Equine training or teaching activities.

(3) Boarding equines.

(4) Riding, driving, inspecting, or evaluating an equine, whether or not monetary consideration or anything of value is exchanged.

(5) Rides, trips, hunts, or other equine activities of any type (even if informal or impromptu) that are sponsored by an equine activity sponsor.

(6) Placing or replacing horseshoes on an equine.

(b) The term does not include being a spectator at an equine activity.

*Id*. (emphasis added). Burdick argues that because this statute does not use the words "sports" or "sports participants," Burdick and Romano could not have been engaged in a sporting activity, so the trial court should have instructed the jury on negligence. *Appellants' Amended Br.* at 43.

[23] We agree with Romano that the statutory definition of equine activity does not preclude sporting activities. The activities listed by the statute as equine activities is not exhaustive, evinced by the words, "'Equine activity,' for purposes of IC 34-31-5, *includes* the following." Ind. Code § 34-6-2-41 (emphasis added). *See Med. & Prof'l Collection Servs., Inc. v. Bush*, 734 N.E.2d

626, 629 n.4 (Ind. Ct. App. 2000) ("We note that 'includes,' rather than being a limiting term, implies a non-exhaustive list[.]").  Moreover, the illustrative list in the statute identifies several sports, including grand prix jumping, polo, western performance riding, and steeplechasing as constituting equine activities. Ind. Code § 34-6-2-41(a)(1).

[24]   Therefore, the trial court did not abuse its discretion in finding that Burdick and Romano were engaged in a sporting activity.  Burdick and Romano were not riding their horses in a pasture or other country terrain but within an arena specifically and exclusively designed for horse training.  *Tr. Vol. 4* at 66.  Both Burdick and Romano described their activities in the arena as tricks and training related to the sport of horse-back riding, where, for instance, Burdick testified that she was going through her training routine in the arena.  *Id.* at 61. As part of the routine, Burdick was "loping" Chip as part of a cool-down after she completed her training routine with Chip.  *Id.*  When Burdick completed her training routine, she accepted Romano's invitation to join her and Sheza to ride in a zig zag pattern through the poles erected in the arena.  *Id.* at 61-62. Burdick and Romano also engaged in other behavior to demonstrate tricks and training techniques associated with the sport.  *Id.* at 56-57, 61-63.  For instance, Burdick characterized putting her hoodie over Chip's eyes as a trick that was a training technique.  *Id.* at 56.  She also testified that without proper training, a horse would "spook" if its head was covered by an object.  *Id.*  Burdick stated that demonstrating to another person how the horse would respond to training is part of the sport.  *Id.* at 57.  Burdick also acknowledged that when Romano

was going to demonstrate that Sheza could push a barrel with her nose, it was to show a technique that Romano had used to train Sheza. *Id*. Also, in explaining the "ground tie" that Romano used after she dismounted Sheza (in Burdick's version of the events), Burdick and Romano testified that a ground tie is a trick or training technique where the rider dismounts the horse, drops the reins to the ground, and the horse stands as if the horse was tied to the ground. *Tr. Vol. 2* at 163; *Tr. Vol. 3* at 244; *Tr. Vol. 4* at 58. Training a horse to stand still during a ground tie is important because if an emergency arises, it may be important for a horse to stay put. *Tr. Vol. 2* at 163. Romano testified that ground training is "definitely part of the equine world." *Id*. at 164. Finally, both Burdick and Romano agreed that Romano was in the process of retrieving a barrel to demonstrate a trick and training technique associated with the sport. *Id*. at 142-43, *Tr. Vol. 3* at 244-45; *Tr. Vol. 4* at 58. Thus, contrary to Burdick's argument, this is not a simple "dog bite" case but instead is a sporting activity case. *See Appellants' Amended Br.* at 12. Our courts have ruled that non-competitive golf, practicing karate kicks, and riding a mountain bike on a trial are sporting activities. Accordingly, we cannot state that the trial court abused its discretion in determining that Burdick's injuries occurred during a sporting event. *See Megenity v. Dunn*, 68 N.E.3d 1080, 1082 (Ind. 2017); *Pfenning*, 947 N.E.2d at 406; *Hoosier Mountain Bike Ass'n, Inc. v. Kaler*, 73 N.E.3d 712, 714-15 (Ind. Ct. App. 2017); and *Gyruiak*, 775 N.E.2d at 395.

[25] Because Burdick and Romano were engaged in a sporting activity, Burdick was required to show that Romano was reckless, not merely negligent. *Megenity*, 68

N.E.3d at 1084-85; *Pfenning*, 947 N.E.2d at 404. Stated differently, a participant's conduct in a sporting activity is unreasonable only if the injured party shows that the co-participant engaged in reckless conduct. *Megenity*, 68 N.E.3d at 1084-85; *Pfenning*, 947 N.E.2d at 404. This burden of proof is supported by public policy.

> [S]trong public policy considerations favor the encouragement of participation in athletic activities and the discouragement of excessive litigation of claims by persons who suffer injuries from participants' conduct. Sound policy reasons support affording enhanced protection against liability to co-participants in sports events. Athletic activity by its nature involves strenuous and often inexact and imprecise physical activity that may somewhat increase the normal risks attendant to the activities of ordinary life outside the sports arena, but this does not render unreasonable the ordinary conduct involved in such sporting activities.

*Id*. at 403.

[26] Because the undisputed evidence shows that Burdick and Romano were engaged in a sporting activity, the trial court did not abuse its discretion in refusing to instruct the jury on negligence for two reasons: First, the evidence did not support an instruction for negligence. *See Kimbrough*, 55 N.E.3d at 339. Second, an instruction on negligence could have confused and misled the jury about Burdick's burden of proof. *See Miller*, 706 N.E.2d at 248. Acordingly, we affirm the trial court's decision to refuse Burdick's tendered instructions on negligence.

## II. Instruction on Inherent Risk of Equine Activities

[27] Burdick also argues that the trial court abused its discretion by instructing the jury on the inherent risks of equine activity. The instruction stated:

> Inherent risks of equine activities include the following: the propensity of an equine to behave in ways that may result in injury, harm or death to persons on or around the equine. The unpredictability of an equine's reaction to such things as sound, sudden movement, unfamiliar objects, people or other animals. The potential of a participant to act in a way that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within the participant's ability.

*Tr. Vol. 4* at 200.

[28] In contending that reading this instruction was an abuse of discretion, Burdick advances the arguments that we addressed in the previous section of this decision about Burdick's claim that the trial court abused its discretion in refusing to instruct the jury on negligence. Accordingly, she has waived this claim for failure to make a cogent argument. *Maggert v. Call*, 817 N.E.2d 649, 651 (Ind. Ct. App. 2004).

[29] Waiver aside, the instruction is an accurate statement of the law as it comes from the statute that defines inherent risks from equine activities. *See* Indiana Code section 34-6-2-69. Although the instruction omitted language from the statue about inherent risks arising from hazards such as surface and subsurface conditions and collisions with other equines or objects, it is otherwise identical

to the language in the statute. This omission was appropriate to make the instruction conform to the facts of the case.

[30] The instruction also omitted the word "negligent" from the statute. This omission was also appropriate because leaving the word "negligent" in the instruction would have confused the jury about Burdick's burden of proof, that is, to show that Romano acted reckless. *See Miller*, 706 N.E.2d at 248 (an instruction or language in an instruction should be rejected if it will mislead or confuse the jury).

[31] Finally, the evidence supported giving the instruction. Burdick testified that, as an expert, she knew the risks associated with horse training and tricks before she walked into the arena. *Tr. Vol. 4* at 61. She admitted that being kicked by a horse was a risk of the sport and testified that a horse getting "spooked" was a risk of the equine activities. *Id*. at 59. She also admitted that horseback riding was dangerous. *Id*. at 99. The evidence supported the instruction on the inherent risks of equine activity, and the trial court did not abuse its discretion in reading the instruction to the jury.

## III. Instruction on Incurred Risk

[32] Burdick also contends the trial court abused its discretion in instructing the jury on incurred risk because the evidence did not support the instruction. The instruction stated:

> [Romano] claims [Burdick] knew of a specific danger, understood the risk she faced, and voluntarily exposed herself to

the danger. In other words, [Romano] claims [Burdick] voluntarily incurred the risk. To prove [Burdick] incurred the risk, [Romano] must prove by the greater weight of the evidence that [Burdick] knew and appreciated the specific risk, and [Burdick] voluntarily accepted the risk. If you decide that [Burdick] incurred the risk, then that conduct is fault that you should assess against [Burdick].

*Tr. Vol. 4* at 200.

[33] Burdick claims the evidence did not support this instruction because there was no evidence that she was aware that Romano might stop Sheza, dismount her, leave her unattended, and walk away to retrieve a barrel to demonstrate a trick. In support, Burdick cites *Colaw v. Nicholson* for the proposition that "[i]ncurred risk contemplates acceptance of a specific risk of which the plaintiff has actual knowledge." 450 N.E.2d 1023, 1029 (Ind. Ct. App. 1983). She also points us to *Forrest v. Gilley* and *Hardin v. Christy* for the same principle. *Forrest*, 570 N.E.2d 934, 935 (Ind. Ct. App. 1991) (person injured after falling off horse), *trans. denied*; *Hardin*, 462 N.E.2d 256, 263 (Ind. Ct. App. 1984) (person injured by horse when exercising the horse).

[34] Contrary to Burdick's claim, the evidence supported the incurred risk instruction. Burdick is mistaken that the incurred risk at issue was Romano's decision to dismount Sheza and leave Sheza untied and unattended. Instead, the risk at issue was Sheza's tendency to kick other horses. Sometime before the incident, Burdick had asked Romano several times to show Burdick the trick where Sheza would push the barrel with her nose. *Tr. Vol. 2* at 140-41.

Burdick was aware of Sheza's history of kicking other horses because Romano told Burdick several times that Sheza was a kicker. *Tr. Vol. 3* at 239; *Tr. Vol. 4* at 61. Burdick also testified that before the incident she had observed Sheza act aggressively toward other horses and attempt to kick other horses. *Tr. Vol. 3* at 239. She also admitted that being kicked by a horse was a risk of the sport and conceded that as a horse expert she knew all the risks associated with horse-related sporting activities. *Tr. Vol. 4* at 59, 61. Therefore, because the evidence supported the incurred risk instruction, the trial court did not abuse its discretion by reading the instruction to the jury.[6]

[35]    Affirmed.


Bailey, J., and Mathias, J., concur.

---

[6] Additionally, in muddled arguments related to the burden of proof, Burdick first appears to contend that when the trial court instructed the jury about Romano's claim that Burdick was partly at fault for her injuries, the trial court misstated Romano's burden of proof. This argument is unclear, unsupported by citation to authority, and Burdick does not develop the argument. Therefore, she has waived the issue for failure to make cogent argument. *See Maggert v. Call*, 817 N.E.2d 649, 651 (Ind. Ct. App. 2004). Second, Burdick complains that "the clear and convincing evidence burden of proof standard applicable to recklessness was never read to the jury – only the preponderance of evidence burden of proof standard applicable to negligence [] was read to the jury." *Appellants' Amended Br*. at 40-41. This argument is equally confusing, so it too is waived for lack of cogent argument. *See Maggert*, 817 N.E.2d at 651. Burdick also does not demonstrate how she was prejudiced by an instruction that advised the jury that Burdick was only required to prove her case by a preponderance of evidence instead of clear and convincing evidence.